## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| INTERNATIONAL BROTHERHOOD ) OF TEAMSTERS, AIRLINE ) DIVISION, ) 25 Louisiana Avenue NW ) Washington, DC 20001 ) ) | Case No.: _____ Hon. _____ |
| and ) ) | |
| AIRLINE PROFESSIONALS ASSOC. ) OF THE INTERNATIONAL ) BROTHERHOOD OF TEAMSTERS, ) LOCAL UNION NO. 1224, ) 2754 Old State Route 73 ) Wilmington, OH 45177 ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | |
| ATLAS AIR, INC., ) 2000 Westchester Avenue, ) Purchase, New York 10577 ) ) | |
| and ) ) | |
| POLAR AIR CARGO WORLDWIDE, ) INC. ) 2000 Westchester Avenue, ) Purchase, New York 10577. ) ) | |
| Defendants. ) _____) | |

## PLAINTIFFS' VERIFIED COMPLAINT
## FOR PRELIMINARY AND PERMANENT INJUNCTIVE
## AND DECLARATORY RELIEF

Plaintiffs International Brotherhood of Teamsters, Airline Division ("IBT") and Airline Professionals Association, Teamsters Local Union No. 1224, an affiliate of the IBT ("Local 1224") (collectively "Plaintiffs" or the "Union") for their complaint against Defendants Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc. (collectively "Atlas," or "Defendants") hereby state:

## JURISDICTION AND VENUE

1.    This is an action for preliminary and permanent injunctive relief, declaratory judgment and other appropriate relief brought pursuant to the Railway Labor Act, 45 U.S.C. § 151, et seq. (hereinafter "RLA" or "the Act"), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  Plaintiffs challenge Defendants' unlawful changes to the RLA statutory status quo by virtue of Defendants' new, unilaterally-imposed requirement that Union-represented pilots operate aircraft that are not safe to fly while maintenance mechanics can fix them. Specifically, Defendants are now forcing said pilots to perform Engine Starts for the purpose of maintenance acceptance, verification or calibration, rather than for contractually permissible flight purposes. This new, unbargained-for maintenance Engine Start requirement constitutes a wholesale, unilateral alteration of the express scope-of-work provisions contained in the parties' collective bargaining agreement specifically defining the "work" that pilots may be required to safely perform. It also constitutes a unilateral alteration of the compensation provision set forth in the parties' collective bargaining agreement. Furthermore, it presents substantial and serious safety issues for the pilots and public at large. Defendants unilaterally imposed this new

requirement while Defendants and Plaintiffs are engaged in negotiations over amendments to their collective bargaining agreement pursuant to RLA Section 6. These changes were not negotiated, were not consented to by the Union, and were made prior to the exhaustion of the mandatory, "major dispute" mechanisms of the RLA for changing the status quo of the pilots' terms and conditions of employment. Therefore, Defendants' unlawful self-help in the form of unilateral implementation of working conditions, without any arguable justification under the parties' collective bargaining agreement, violates the RLA and its status quo provisions, thereby entitling Plaintiffs not only to immediate injunctive relief but also resort to a strike to restore the status quo.

2.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337, 2201, and 2202. Inasmuch as the Union continues to labor under the terms of this Court's preliminary injunction order, dated November 30, 2017 in *Atlas Air, Inc., et al. v. International Brotherhood of Teamsters, et al.*, Case No. 1:17-cv-01953-RDM, (D.D.C), ECF Doc. # 60, appeal pending, *International Brotherhood of Teamsters et al. v. Atlas Air, Inc., et al.*, Case No. 17-7172 (D.C. Cir.) (the "Injunction Case"), Plaintiffs also seek a declaration that the Union and its representatives and agents will not be in violation of said injunction by informing Defendants' pilots that they have a legal right not to perform Engine Starts as mandated by Defendants' unilateral and unlawful directive.

3.      The Norris-LaGuardia Act, 29 U.S.C. § 101, *et seq.*, does not deprive this Court of jurisdiction over the Plaintiffs' claims for injunctive relief because this action is brought to enforce the mandatory procedures of the RLA, 45 U.S.C. § 151, *et seq.*

4.      Venue under 28 U.S.C. § 1391(b)(1) and (2) is proper in, and personal jurisdiction over Defendants exists in, this District where Defendants regularly conduct business operations and maintain substantial contacts. Further, this case is inextricably intertwined with and related to the Injunction Case, 1:17-cv-01953-RDM pending in this Court and the United States Court of Appeals for the District of Columbia.

## THE PARTIES

5.      Plaintiff IBT is a labor organization and is the exclusive bargaining representative, as such term is defined by Section 1, Sixth of the Railway Labor Act ("RLA"), 45 U.S.C. § 151, Sixth, of the pilots employed by Defendant Atlas and who fly aircraft for and on behalf of Atlas and Polar. The IBT is headquartered at 25 Louisiana Avenue, N.W., Washington, D.C. 20001. This action is brought by the IBT in its own behalf and for and in the interests of all IBT-represented pilots employed in the service of Defendants. The National Mediation Board ("NMB") determined that Atlas and Polar constitute a single transportation system for RLA representation purposes on September 29, 2008. Thereafter, on December 28, 2008, the NMB certified the IBT as the exclusive representative of the craft or class of Pilots in the employ of Defendants Atlas and Polar as a single transportation system for representation purposes.

6.     Plaintiff Local 1224 is a labor organization headquartered at 2754 Old State Route 73, Wilmington, Ohio 45177. It is a chartered local union affiliate of the IBT. The IBT has delegated to IBT Local 1224 the exclusive responsibility of providing day-to-day representation to the IBT-represented pilots employed by Defendants.

7.     Defendants Atlas and Polar are air carriers within the meaning of the RLA, 45 U.S.C. § 181.  Defendants engage in world-wide cargo operations for various customers including DHL and "Amazon Prime" or Amazon Air.  Although Defendants each hold separate air carrier operating certificates from the United States Department of Transportation's Federal Aviation Administration ("FAA"), they function as a "single transportation system" under the RLA for purposes of labor relations involving their pilot group, and Atlas is the employer of all of the pilots who fly for both Defendants Atlas and Polar. Both Atlas and Polar are Delaware corporations and are headquartered at 2000 Westchester Avenue, Purchase, New York 10577.

## FACTS

8.     The Union and Defendants are parties to a collective bargaining agreement ("CBA") covering the rates of pay, rules and working conditions of the IBT-represented pilots employed by Atlas. A true and accurate copy of the CBA is attached as Exhibit 1 and incorporated herein by reference.

9.     Since early 2016, the Union and Defendants have been involved in a collective bargaining dispute over the amendment of the CBA. In this regard,

pursuant to RLA Section 6,  45 U.S.C. § 156, in early January, 2016, the Union and Defendants commenced collective bargaining negotiations to amend their extant CBA and those negotiations are on-going.

### The Unprecedented Atlas Engine Start Operations Bulletin

10.     On or about February 2, 2019, Atlas issued Operations Bulletin OB-19-01 ("OB-19-01"), ordering that pilots perform Engine Starts for maintenance acceptance, verification or calibration on revenue flights. Through OB-19-01, Defendants are requiring pilots to conduct maintenance worker functions before an aircraft has been released by maintenance personnel and certified by those maintenance personnel as being airworthy and therefore ready for return to service, i.e., flying. These maintenance actions include starting aircraft powerplants (i.e., engines) and auxiliary power systems, and/or operating associated aircraft systems or flight controls for the purpose of diagnosing, evaluating, or complying with required maintenance action before an airworthiness release has been issued by a qualified maintenance representative.  A true and accurate copy of OB-19-01 is attached as Exhibit 2 and incorporated herein by reference.

### The CBA's Definitions on Pilot Work Duties

11.     Section 2.II. of the CBA explicitly defines the "work" of the Union-represented pilots, stating:

> **II. Work:** "Work" shall include a flight assignment, a deadhead assignment, reserve, layover, or training (other than hone-based training).

(Exhibit 1 at pg. 14)  Of these various categories of "work" that a pilot may be required to perform, only a "flight assignment" entails actual operation of an aircraft.

12.     With respect to flight assignments (i.e., aircraft operations) which pilots may be required to perform, pilots are compensated based on the accumulation of "Block Hours."  The CBA defines "block hours" in Section 2.H. as follows"

> **H. Block Hours:** "Block Hours" means the period from the time the aircraft blocks out until the aircraft blocks in again. Block in shall be the moment that an aircraft comes to complete rest in the blocks. Block out shall be the time when an aircraft's brakes are released and push back or taxi begins.

(Exhibit 1 at pg. 11)

## FAA Operational Procedures for Safe Flight

13.     For pilots in the service of Defendants, all training and operational procedures pertaining to flight assignments and the operation of aircraft center upon operating an aircraft that has already been cleared and certified as "airworthy" and therefore ready to operate for the purpose of flight. In other words, those procedures are all executed with the expectation that the aircraft is deemed airworthy and therefore free of all defects that would render the aircraft unairworthy.

14.     In cases where a known defect exists on an aircraft that does not in and of itself necessarily render the aircraft unairworthy, Defendants' operational guidance procedures allow pilots to fly the aircraft with said known defect, and pilots are provided additional guidance in order to operate the aircraft safely with such defect. Said guidance is referred to as Minimum Equipment List ("MEL"), Dispatch Deviations Guide ("DDG"), and Configuration Deviation List ("CDL") items.  Absent specific guidance pertaining to MEL, DDG or CDL items, a pilot may not legally

7

initiate a flight assignment until all defects on the aircraft have been corrected and/or repaired and the aircraft has been deemed airworthy and released back into service by a certified maintenance representative.

15.    As a matter of Federal Aviation Administration ("FAA") regulatory requirements and Defendants' own corresponding FAA-approved operational procedure documents, an aircraft's maintenance logbook must be presented to the piloting Captain before flight. All known defects on the aircraft must be documented by an appropriately rated and licensed aircraft mechanic as either repaired or deferred before the piloting Captain can take command of the aircraft. In this regard, FAA Certified Transport Category aircraft, such as those operated by Defendants, have multiple layers of redundancy and those related systems and components by design of the manufacturer provide the aircraft the ability to be operated in limited situations with certain components inoperative or deactivated provided that certain maintenance steps and procedures are followed.  In such cases where the defects are not repaired and have instead been deferred, specific guidance is available to the aircraft's Captain in the MEL, DDG or CDL manuals as to how to safely operate the aircraft with consideration and guidance provided for the purpose of conducting a flight. Nonetheless, with regard to evaluating whether or not an aircraft may be deemed airworthy despite existing known defects, an appropriately rated and licensed aircraft mechanic who is trained and familiar with all of the aircraft operator's policies and procedures to include familiarity with all aircraft manufacturer guidance and manuals, must make those determinations.

8

**Defendants' Pilots are Untrained on Maintenance Duties**

16.     All training and procedures that are provided to Defendants' pilots are exclusively focused and centered upon operating an airworthy aircraft to perform an actual flight assignment.  Defendants' pilots are not trained in any capacity to operate any aircraft powerplant/engine, Auxiliary Power Unit ("APU"), or any other aircraft system (e.g., hydraulic system) in any capacity except for the express purpose of flight and completion of a flight assignment. They are also untrained on how to safely perform maintenance Engine Starts. Indeed, before every flight where certain aircraft systems or components may be inoperative or deactivated or where defects exist as allowed by the aircraft manufacturer, pilots are provided guidance by an appropriately rated, licensed and trained aircraft mechanic.

17.     In the context of operating a powerplant/engine, APU or other aircraft system, pilots have specific procedures that must be complied with to preclude those systems exclusively or collectively from creating a hazardous condition in or around the aircraft. Those procedures are all predicated upon an aircraft first being released from maintenance as "airworthy," with all known defects identified in the logbook as either having been repaired or deferred by a maintenance representative.

18.     In those limited cases where an aircraft crew may need to reposition an aircraft at an airport, they must follow all procedures as if preparing for and conducting a flight on an airworthy aircraft.  This includes having the aircraft logbook on board, with all maintenance defects cleared and/or deferred in accordance with manufacturer requirements. These procedures are followed from startup and block-

out to block-in just as if the pilots were preparing to conduct a regular flight, including the prerequisite airworthiness release prior to operating any aircraft powerplant/engine, APU or other system.

## **Unilateral Change of the Pilots' Work and Compensation**

19.     Through the recent unilateral issuance of OB-19-01, and by requiring the pilots to perform maintenance related Engine Starts, and without any arguable justification under the parties' CBA, Defendants have imposed a requirement on pilots to operate an aircraft for purposes other than flight or taxi movement without any corresponding compensation. This action by the Defendants constitutes an unlawful change in the rates of pay and terms and conditions of employment of pilots prior to the exhaustion of the mandatory, "major dispute" mechanisms of the RLA for changing the status quo of pilot rates of pay and terms and conditions of employment.

20.     Section 3.A.2.a.ix of the CBA contains an express provision negotiated by the Union and Defendants for conducting aircraft taxi movements and for compensating pilots accordingly, which states:

> When a Crewmember is performing duties at an airport in conjunction with a scheduled flight and the Crewmember performs a taxi movement(s), either prior to or after a flight, the Crewmember shall be paid for the taxi movement on the basis of block time. However, if a Crewmember reports to the airport for the sole purpose of performing a taxi movement with no planned flight activities, he shall receive credit for actual block time or as provided in subsection 3.A.2.a.iv., above, whichever is greater.

(Exhibit 1 at pg. 19).

21.     Through the unilateral issuance of OB-19-01, and without any arguable justification under the parties' CBA, Defendants have imposed a new requirement on

pilots to operate an aircraft for purposes other than flight or taxi movement without any corresponding compensation. This action by the Defendants constitutes an unlawful change in the rates of pay and terms and conditions of employment of pilots prior to the exhaustion of the mandatory, "major dispute" mechanisms of the RLA for changing the status quo of pilot rates of pay and terms and conditions of employment.

### Unilateral Imposition of a Work Rule Impacting Pilot and Public Safety

22.     Through the unilateral issuance of OB-19-01, Defendants have also imposed a working condition requiring untrained pilots to engage in unsafe operations in derogation of the RLA status quo between the parties, whereby both parties and the pilots are expected to adhere to rules, including rules demarking the work of aviation mechanics and the work of pilots regarding the maintenance and flying of Defendants' aircraft, respectively.  In this regard, a jet engine is incredibly powerful. At normal power, it can produce over 60,000 lbs. or more of thrust. The high velocity air that exhausts out the back of the engine has two jets of exhaust that combine to create what is referred to as "jet blast." Hot exhaust gasses from the engine generally make up about 20% of the jet blast, and 80% of the remaining air is propelled by a large diameter fan that accelerates the air to extreme velocities and provides the majority of the propulsive force of the motor.  A typical medium size jet engine at idle thrust, such as that associated with the maintenance-related Engine Starts required by of OB-19-01, can produce a deadly jet blast area as far back as 400 feet behind the engine. The same engine at take-off power similarly produces a potentially deadly wake as far back as 1,900 feet behind the engine.

23.     A jet engine also has an invisible and equally as deadly suction zone around the entire frontal area of the jet engine. This area, when an engine is at idle following a normal Engine Start, extends outward by approximately 16 feet on a smaller sized jet.  At take-off power, that suction zone extends out and in front of the engine by over 75 feet.

24.     A National Aeronautics and Space Administration Aviation Safety and Reporting System ("NASA ARS") study concluded that 45% of all accidents related to jet blast come from Large Transport aircraft like the ones that are operated by Atlas. Of these reported accidents, 53% of them involved accidents and incidents while an engine was running on the ramp where ground vehicles, cargo containers and personnel exist.  Indeed, deadly accidents have  occurred, and one such incident cited by the National Transportation Safety Board ("NTSB") in accident investigation report DFW06FA056 detailed the events leading up to a fatal accident where a mechanic was sucked into the engine of a smaller aircraft operated by Defendants, namely a Boeing-737, during a maintenance-related Engine Start by pilots at Continental Airlines.  The mechanics in that case were not trained to operate the aircraft and the pilots were authorized to start the engine for them. This combination of untrained and unfamiliar personnel proved deadly to one of the mechanics who was sucked into the running engine following an Engine Start and shredded to bits.

## Union's Demand to Atlas to Cease and Desist

25.     On or about February 2, 2019, and again on February 5, 2019, the Union emailed Defendants insisting that they cease and desist requiring pilots to perform

maintenance-related Engine Starts and rescind OB-19-01 in order to restore the status quo.  To date, however, Defendants have refused to comply and have refused to rescind OB-19-01.

26.    Defendants' new requirement for pilots to perform maintenance-related Engine Starts is an unlawful, unilateral change by Defendants in the rates of pay and terms and conditions of employment of the pilots, in violation of the RLA's status quo provisions. Such unilateral change was made without any arguable justification under the CBA, and therefore constitutes a "major dispute" under the RLA.

27.    For the above reasons, a breach of the statutory status quo with respect to the CBA and has occurred and is continuing to occur, and/or further breaches of the same have been threatened and will occur, unless and until injunctive relief is granted.

## CAUSES OF ACTION

## COUNT I

## (Violation of Section 6 of the RLA)

28.    The allegations of paragraphs 1 through 27 are incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

29.    Section 6 of the RLA, 45 U.S.C. § 156, provides:

Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with

reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

30.    RLA Section 6 as set forth above provides that carriers shall not alter the terms of a collective bargaining agreement or working conditions except as provided in Section 6, which requires express notice and bargaining during the amendable period set forth by parties.

31.    Defendants did not amend the CBA and working conditions set forth herein pursuant to Section 6 bargaining under the RLA, but instead unilaterally and unlawfully altered agreements affecting rates of pay, rules, or working conditions in continuing violation of RLA Section 6, 45 U.S.C. § 156.

## COUNT II

## (Violation of Section 2, Seventh of the RLA)

32.    The allegations of paragraphs 1 through 31 of the Complaint are incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

33.    Section 2, Seventh of the RLA, 45 U.S.C. §152, Seventh, states:

No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

34.    The continuing acts and conduct by Defendants in unilaterally changing the Atlas pilots' rates or pay and terms and conditions of employment as embodied in the CBA during negotiations for amendments to the CBA are in violation of RLA

Section 2, Seventh's requirement that it maintain the status quo while such statutory collective bargaining procedures continue.

## COUNT III

### (Violation of Section 2, First of the RLA)

35.     The allegations of paragraphs 1 through 34 of the Complaint are incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

36.     Section 2, First of the RLA, 45 U.S.C. §152, First, states:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

37.     The continuing acts and conduct by Defendants in unilaterally changing the Atlas pilots' status quo working conditions, and the terms and conditions of employment as embodied in the CBA during negotiations for amendments to the CBA are in violation of Section 2, First of the RLA, 45 U.S.C. §152, First, in that Defendants have not exerted every reasonable effort to maintain agreements as to rates of pay, rules and working conditions, nor to settle disputes.

## IRREPARABLE INJURY

38.     The allegations of paragraphs 1 through 37 are incorporated by reference pursuant to Fed. R. Civ. P. Rule 10(c).

39.     Defendants' violations of their obligations under Sections 2, First, Seventh and Section 6 of the RLA set forth in Counts I-III undermine the Act's

statutory purpose to prevent disruptions to interstate commerce through bargaining in conference between carriers and their employees and, therefore, are contrary to the public interest. As such, there is no obligation on the part of Plaintiff to show irreparable injury because courts may enjoin a violation of the status quo pending completion of the required Section 6 procedures, without the customary showing of irreparable injury.

40.    In addition to the irreparable injury to the statutory purposes and machinery of the Act, the illegal and wrongful acts and conduct described under Counts I-III are continuing and, if not enjoined, the Union and employees it represents will be injured in ways that cannot be measured accurately in terms of money, either as to extent or amount.

41.    As a proximate result of the Defendants unlawful practices:

a.    By means of the aforementioned acts, Defendants have undermined Plaintiffs' status as the exclusive bargaining representative of the Atlas pilots by unilaterally altering rates or pay, and terms and conditions of employment;

b.    The bargaining process will be undermined and the parties effectively prevented from reaching agreement; and

c.    Defendants conduct is contrary to the public interest in stable labor relations and the maintenance of agreements, as well as their orderly change through the Act's procedures.

      d.     Defendants' conduct presents a clear and present danger to the pilots and the public at large.

42.    The injury being suffered by the public, the Plaintiffs and pilots is irreparable and continuing and cannot be recovered in an action at law or in administrative or contractual proceedings.

43.    For all the foregoing reasons, Plaintiffs and the Atlas pilots are without an adequate remedy at law and will suffer serious, substantial and irreparable injury unless Defendants' unlawful conduct is enjoined.  The public interest in the RLA and interstate commerce requires that injunctive relief issue.

44.    Defendants will not be injured by granting of injunctive relief requiring it to comply with its duties under the RLA and to restore the status quo.  Defendants are required by statute to address any operational or financial need for changes to existing agreements only through bargaining under the procedures of the RLA.

## COUNT IV

## Declaratory Judgment

45.    The allegations of paragraphs 1 through 44 are incorporated by reference pursuant to Fed. R. Civ. P. Rule 10(c).

46.    In the Injunction Case, this Court ordered:

> Defendants [the Union herein], their officers, agents, employees, members employed by Plaintiffs, and all persons acting in concert with any of them be, are hereby preliminarily enjoined from authorizing, encouraging, permitting, calling, engaging in, or continuing any strike, work stoppage, sick-out, concerted refusal to volunteer for or to accept work assignments (including, without limitation, open time flights), slowdown (including, without limitation, the existing SHOP and BOOT campaigns), or other self-help against Plaintiffs relating to the dispute

or disputes arising from the Section 6 notice served in the round of bargaining that commenced on or about February 2016.

(Injunction Case, ECF Doc. No. 60).

47.    While it is generally true that parties engaged in mediation under the supervision of the NMB pursuant to the RLA cannot engage in self-help to leverage their contract negotiations prior to the exhaustion of RLA's Section 5 and Section 6 negotiations processes, this principle does not resolve the issue of what the non-breaching party's rights are when the other engages in self-help by violating the status quo prior to resolution of the Section 6 and Section 5 processes. In such situations, the courts have recognized that the other party to the agreement, i.e., the status quo victim, may itself engage in self-help. *See, e.g., Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 154 (1969) ("[i]f the railroad is free at this stage to take advantage of the agreement's silence and resort to self-help, the union cannot expected to hold back on its own economic weapons including the strike"). Accordingly, the Supreme Court and other courts have held that a union lawfully may strike over a status quo major dispute violation if the carrier violates the status quo and has not restored the status quo before the strike takes place. *Detroit & Toledo at 154; Atlanta & W. Point R.R. Co. v. United Transp. Union*, 439 F.2d 73, 80 (5th Cir. 1971) ("the union had the right to strike; that right continues until the Act is complied with by the Carrier.") (quoting U*nited Industrial Workers v. Board of Trustees of Galveston Wharves*, 400 F.2d 320, 333 (5th Cir. 1968), cert. denied, 404 U.S. 825 (1971)); *see also Nat'l Airlines, Inc. v. Int'l Ass'n of Machinists &*

*Aerospace Workers*, 416 F.2d 998, 1003, n.3 (5th Cir. 1969) (noting that RLA status quo strike is terminable after carrier complies with the statute).

48.     Section 26.R of the CBA provides that "[n]othing in this Agreement will be construed to require a Crewmember to take any action if he reasonably believes that such action will result in substantial and imminent risk of harm to the Crewmember or his equipment." (Exhibit 1 at pg. 197). This Court's November 30, 2018 preliminary injunction order in the Injunction Case arguably prevents the Union from advising pilots of their rights to refuse unsafe work under Section 26.R of the CBA when considering whether to perform maintenance-related Engine Starts.

49.     Although it believes it has a lawful right to do so with respect to Defendants' violation of the RLA's status quo violations as described in this action, the Union has not called for a status quo strike in this case at this time.  Should it do so, however, the Union faces potential liability under the Court's preliminary injunction order in the Injunction Case.  The Union therefore seeks a declaration that neither the Union, nor their officers, agents or representatives would be in violation of the Court's November 30, 2017 preliminary injunction order issued in the Injunction Case should the Union call for a status quo strike, advise the pilots employed by Defendants not to perform maintenance-related Engine Runs, and/or advise the pilots that they have contractual right not to perform any action that they reasonably believe that such action would result in substantial and imminent risk to him or his equipment.

## **PRAYER FOR RELIEF**

Plaintiffs request judgment against Defendants for the following relief:

A.     That Defendants and their officers, agents and representatives be ordered to restore the status quo regarding the unilateral changes and breaches outlined above, to cease and desist from altering the terms of the CBA, and to adhere to the terms of the CBA and status quo working conditions unless and until those terms are altered in Section 6 bargaining with Plaintiffs;

B.     That the Court declare that Plaintiffs may communicate with their pilot members that they need not accept such unsafe assignments and that such communications by Plaintiffs and/or pilot actions do not violate this Court's November 30, 2017 preliminary injunction order in the Injunction Case, 1:17-cv-01953-RDM;

C.     That the Court declare that Plaintiffs would not be in violation of this Court's November 30, 2017 preliminary injunction order in the Injunction Case should Plaintiffs call for a status quo strike, advise the pilots employed by Defendants not to perform maintenance-related Engine Runs, and/or advise the pilots that they have contractual right not to perform any action that they reasonably believe that such action would result in substantial and imminent risk to them or their equipment.

D.   That Defendants be ordered to conspicuously post copies of this Court's order in this case at all locations where pilots are based for a period of one-hundred eighty (180) days;

E.   That Defendants be ordered to provide a copy of this Court's order in this case to every pilot who has been covered under the CBA since 2016, by certified mail at their most current address of record, in order to ameliorate the effects of Defendants' unlawful conduct on these employees' rights under the RLA;

F.   That the Court issue preliminary and permanent injunctive relief restoring the status quo and enjoining Defendants and its officers, agents and representatives from: 1) breaching the CBA and status quo working conditions; 2) from interfering with, coercing, or discriminating against pilots covered by that CBA; and 3) from negotiating in bad faith with the IBT;

G.   That Defendants be ordered to make pilots adversely affected by the Defendants' violations whole;

H.   That Plaintiffs be awarded their costs;

I.     That the Court grant Plaintiffs all additional relief that may be equitable, including a reasonable award of attorneys' fees.


Dated: March 7, 2019                        Respectfully submitted,


/s/ Edward M. Gleason                    /s/ Joshua D. McInerney

Edward M. Gleason                         Joshua D. McInerney

(D.C. Bar No. 429325)                    (D.C. Bar No. 479471)

LAW OFFICE OF                          James Petroff (admission pending)

EDWARD GLEASON, PLLC            BARKEN MEIZLISH, LLP

910 17th Street, N.W., Suite 800      250 East Broad Street, 10th Floor

Washington, DC 20006                  Columbus, Ohio 43215

Ph: (703) 771-7815                      Ph.: (624) 221-4221

egleason@gleasonlawdc.com          Fax: (624) 744-2300

                                        jmcinerney@barkanmeizlish.com

                                        jpetroff@barkanmeizlish.com


*Counsel for Plaintiffs*

## VERIFICATION

I, John Hutelin, certify under penalty of perjury that: (1) I am a member of the Executive Council of the Atlas Air pilots represented by the International Brotherhood of Teamsters, Airline Division, and its local union affiliate, Airline Professionals Association of the International Brotherhood of Teamsters, Local Union No. 1224; (2) I am a licensed commercial pilot employed by Atlas Air, Inc., and hold an Airline Transport Certificate issued by the Federal Aviation Administration ("FAA"); (3) I previously worked an airline mechanic for a commercial airline in the United States, and hold an Airframe and Powerplant Certificate, also issued by the FAA; (4) I am familiar with the matters stated in the foregoing Complaint; and (5) the facts stated therein are true and correct.

Executed_____ 6th, March, 2019                  _____

                                                        John Hutelin