## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, AIRLINE DIVISION; and
AIRLINE PROFESSIONALS ASSOCIATION
OF THE INTERNATIONAL BROTHERHOOD
OF TEAMSTERS, LOCAL UNION NO. 1224,

                      Plaintiffs,

    v.

ATLAS AIR, INC. and POLAR AIR CARGO
WORLDWIDE, INC.,

                      Defendants.

Civil Action No. 1:19-CV-00651-RDM

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 4

      A.    The Parties ..................................................................................................... 4

      B.    Maintenance-Related Engine Starts ........................................................... 4

      C.    Evidence of Past Practice ............................................................................ 8

      D.    Operations Bulletins 19-01 and 19-04 ...................................................... 9

      E.    The Court's November 30, 2017 Preliminary Injunction ......................... 9

      F.    The Current Dispute .................................................................................. 10

ARGUMENT ..................................................................................................................... 11

    I.     STANDARD FOR DISMISSING A CLAIM UNDER RULES 12(B)(1)
          AND 12(B)(6) .............................................................................................. 11

    II.    PLAINTIFFS' CLAIMS FOR INJUNCTIVE AND DECLARATORY
          RELIEF SHOULD BE DISMISSED UNDER RULE 12(B)(1) BECAUSE
          THEY RAISE MINOR DISPUTES OUTSIDE THE SUBJECT MATTER
          JURISDICTION OF THE COURT .............................................................. 12

      A.    Plaintiffs' Request for Injunctive Relief Should Be Denied
             Because Allowing Pilots To Perform Maintenance Related Engine
             Starts Voluntarily Is At The Very Least Arguably Justified By The
             CBA as Interpreted in Light of Past-Practice .......................................... 15

      B.    Plaintiffs' Request For Declaratory Relief Should Be Denied
             Because Allowing Pilots To Perform Maintenance-Related Engine
             Starts Is At The Very Least Arguably Justified By The CBA as
             Interpreted in Light of Past Practice And Because It Would
             Conflict With This Court's Injunction ..................................................... 20

    III.   PLAINTIFFS' CLAIMS FOR INJUNCTIVE AND DECLARATORY
          RELIEF SHOULD BE DISMISSED UNDER RULE 12(B)(6) BECAUSE
          THEY FAIL TO PLAUSIBLY STATE CLAIMS FOR RELIEF ...................... 22

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc.*,
   869 F.2d 1518 (D.C. Cir. 1989) ........................................................................ 14, 15

*Airline Prof'ls Ass'n of the Int'l Bhd. of Teamsters v. ABX Air, Inc.*,
   No. 00-4109, 2001 WL 1609934 (6th Cir. Dec. 31, 2001) ...................................... 15

*Andrews v. Louisville & Nashville R.R.*,
   406 U.S. 320 (1972) ............................................................................................. 13

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................... 11, 12

*Atlanta & W. Point R.R. v. United Transp. Union*,
   439 F.2d 73 (5th Cir. 1971) ................................................................................... 21

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,
   280 F. Supp. 3d 59 (D.D.C. 2017) ........................................................... 10, 20, 22

*Atlas Air, Inc./Polar Air Cargo Worldwide, Inc.*,
   35 NMB 259 (2008) .............................................................................................. 4

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................................................... 11, 12

*Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R.*,
   879 F.3d 754 (7th Cir. 2017) ........................................................................... 15, 16

*Bhd. of Locomotive Eng'rs v. Louisville & Nashville R.R.*,
   373 U.S. 33 (1963) ............................................................................................... 13

*Bhd. of Maint. of Way Emps. Div./IBT v. Nat'l R.R. Passenger Corp.*,
   217 F. Supp. 3d 249 (D.D.C. 2016) ................................................................. 11, 15

*Bhd. of Maint. of Way Emps. v. Burlington N. Santa Fe R.R.*,
   270 F.3d 637 (8th Cir. 2001) ............................................................................... 14

*Bhd. of R.R. Signalmen v. Nat'l R.R. Passenger Corp.*,
   310 F. Supp. 3d 131 (D.D.C. 2018) ........................................................... 11, 14, 15

*Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*,
   394 U.S. 369 (1969) ............................................................................................. 13

*Bhd. of Ry. & S.S. Clerks, Freight Handlers, Express & Station Emps. v. Fla. E. Coast Ry.*,
   384 U.S. 238 (1966) ............................................................................................. 13

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Consol. Rail Corp. v. Ry. Labor Execs. Ass'n*,
   491 U.S. 299 (1989) .................................................................................................... passim

*Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*,
   238 F.3d 1300 (11th Cir. 2001) ......................................................................................... 16

*Detroit & T. S. L. R.R. v. United Transp. Union*,
   396 U.S. 142 (1969) ........................................................................................................... 12

*Elgin, J. & E. Ry. v. Burley*,
   325 U.S. 711 (1945) ........................................................................................................... 13

*Hinton v. Corr. Corp. of Am.*,
   624 F. Supp. 2d 45 (D.D.C. 2009) ..................................................................................... 24

*Ibrahim v. Mid-Atlantic Air of DC, LLC*,
   802 F. Supp. 2d 73 (D.D.C. 2011) ..................................................................................... 11

*IBT/HERE Emp. Representatives Council v. Gate Gourmet Div. Americas*,
   377 F. Supp. 2d 54 (D.D.C. 2005) ..................................................................................... 15

*International Association of Machinists and Aerospace Workers v. Southern Pacific
   Transportation Co.*,
   Civil No. S-80-150, 1980 WL 2170 (E.D. Cal. July 11, 1980) ........................................... 3, 25

*Kaempe v. Myers*,
   367 F.3d 958 (D.C. Cir. 2004) ........................................................................................... 23

*Page v. Mancuso*,
   999 F. Supp. 2d 269 (D.D.C  2013) ............................................................................... 23, 24

*Pennsylvania R.R. v. Day*,
   360 U.S. 548 (1959) ........................................................................................................... 13

*Rivera v. Rosenberg & Assocs., LLC*,
   142 F. Supp. 3d 149 (D.D.C. 2015) ................................................................................... 24

*Ry. Labor Exec. Ass'n v. Norfolk & W. Ry.*,
   833 F.2d 700 (7th Cir. 1987) ............................................................................................. 14

*Spiller v. D.C.*,
   2019 WL 689778 (D.D.C. Feb. 19, 2019) .......................................................................... 11

*United Air Lines, Inc. v. Air Line Pilots Ass'n Int'l*,
   No. 08 cv 4317, 2008 WL 4936847 (N.D. Ill. Nov. 17, 2008) ............................................. 16

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,*
    563 F.3d 25 (7th Cir. 2009) ................................................................................... 22

*United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers,*
    243 F.3d 349 (7th Cir. 2001) ................................................................................. 22

*W. Wood Preservers Inst. v. McHugh,*
    292 F.R.D. 145 (D.D.C. 2013) ............................................................................... 23

**Statutes**

45 U.S.C. § 152 .......................................................................................................... 12

45 U.S.C. § 153 .......................................................................................................... 13

45 U.S.C. §§ 151 *et seq.* ............................................................................................... 1

45 U.S.C. § 155 .......................................................................................................... 13

45 U.S.C. § 156 .......................................................................................................... 13

**Regulations**

14 C.F.R. § 135.100 .................................................................................................... 19

14 C.F.R. § 139.305 .................................................................................................... 19

14 C.F.R. § 139.311 .................................................................................................... 19

14 C.F.R. § 139.329 .................................................................................................... 19

## PRELIMINARY STATEMENT

For more than a decade, pilots for defendant Atlas Air, Inc. ("Atlas") have performed maintenance-related engine starts – as distinct from starting the engine of an aircraft prior to initiating a flight – when requested to do so by an aviation maintenance technician (a "technician").  Despite this established past practice, and despite the fact that these maintenance-related engine starts by pilots are entirely voluntary and not required by Atlas, the International Brotherhood of Teamsters, Airline Division and the Airline Professional Association of the International Brotherhood of Teamsters, Local Union No. 1224 (referred to collectively as "IBT" or the "Union") inaccurately allege in their complaint that Atlas has unilaterally altered the pilots' working conditions and terms of employment by "requiring" and "forcing" pilots to conduct maintenance-related engine starts, thereby purportedly creating a major dispute under the Railway Labor Act (the "RLA"), 45 U.S.C. §§ 151 *et seq*.  The Union seeks an injunction to preclude Atlas from "requiring" pilots to perform maintenance-related engine starts, and a declaratory judgment that the Union may institute a major dispute strike against Atlas, including directing pilots on a concerted basis not to perform maintenance-related engine starts, without breaching the preliminary injunction issued against the Union by this Court on November 30, 2017.

The Union's claims for injunctive and declaratory relief should be dismissed under Federal Rule of Civil Procedure 12(b)(1) because the Court lacks subject matter jurisdiction. Under the RLA, disputes between carriers and unions representing their employees concerning the interpretation or application of a collective bargaining agreement ("CBA") are subject to the exclusive jurisdiction of an arbitration panel called the System Board of Adjustment.  So long as a carrier's contractual justification for its actions is "arguably justified" by express or implied

terms of a CBA, and not "frivolous or obviously insubstantial," only the System Board has

jurisdiction over the dispute. *Consol. Rail Corp. v. Ry. Labor Execs. Ass'n* ("*Conrail*"), 491 U.S.

299, 307 (1989).

Here, Atlas' contractual basis for allowing technicians to ask pilots to perform

maintenance-related engine starts voluntarily is in no way frivolous or obviously insubstantial.

Although the CBA does not address maintenance-related engine starts expressly, pilots have an

established past practice over many years of conducting such engine starts at the request of a

technician, and the Union has raised absolutely no objection until the recent events leading to

this lawsuit. Accordingly, maintenance-related engine starts performed by pilots voluntarily

when requested by a technician have become an implied term of the CBA that, at the very least,

provides an "arguable justification" on the part of Atlas for allowing the past practice to

continue. For this reason, the complaint presents a minor dispute under the RLA, not a major

dispute, and thus the legal predicate for both the Union's requested injunction and declaratory

judgment cannot be sustained.

The Union's request for declaratory relief also should be dismissed because it improperly

seeks to evade the injunction issued by this Court on November 30, 2017. By way of its

injunction, the Court, among other things, prohibited IBT from engaging in a strike or a

concerted slowdown, including but not limited to directing pilots to refuse voluntary work

assignments in contravention of the pilots' past practice. The circumstances in which that

injunction was issued, where the parties were engaged in a collective bargaining process, have

not changed. But now, with absolutely no legitimate justification under the RLA or the CBA to

support its request, the Union asks the Court for permission to do what the Court has already said

it cannot do. This would result in the very type of disruption to operations and commerce that

this Court found to be a violation of Section 2, First of the RLA, and thus should not be permitted.

Alternatively, the Union's claims for injunctive and declaratory relief should be dismissed under Rule 12(b)(6) for failure to state a claim.  As the Union well knows, the allegations that Atlas pilots are "required" or "forced" to perform maintenance-related engine starts are demonstrably false.  The operations bulletin relied upon by the Union in its complaint does not, by its terms, "require" or "force" pilots to perform maintenance-related engine starts, but rather only provides "guidelines" if the pilot performs the engine start upon request of the maintenance technician.  And a subsequent clarifying bulletin issued by Atlas expressly confirms that "[a] pilot's decision whether to perform such an engine start is voluntary."  The complaint's allegation that Atlas has altered the status quo working conditions by "requiring" and "forcing" pilots to perform maintenance-related engine starts therefore is contradicted directly by the relevant documents referenced in the complaint.  The complaint accordingly fails to state a plausible claim, and should be dismissed.

The complaint also fails to state a claim because an alleged change regarding voluntary maintenance-related engine starts does not involve a change to working conditions and terms of employment within the meaning of the status quo provisions in Section 6 and Section 2, Seventh of the RLA.  This was expressly recognized in *International Association of Machinists and Aerospace Workers v. Southern Pacific Transportation Co.*, Civil No. S-80-150, 1980 WL 2170, at *4 (E.D. Cal. July 11, 1980) (union's request for major dispute injunction denied because "by no stretch of the imagination" can voluntary alcohol-testing implemented pursuant to individual employee decisions "be construed to be a change in working conditions").

For all of these reasons, the complaint should be dismissed with prejudice.

## STATEMENT OF FACTS

### A.      The Parties

Atlas is a commercial air carrier with national and international operations.[1]  (Compl.

¶ 7.)  IBT is the certified collective bargaining representative of the Atlas pilots under the RLA.

(*Id.* ¶ 5.)  Atlas and the IBT Airline Division are parties to a CBA governing the rates of pay,

rules, and working conditions of the Atlas pilots.  (*Id.* ¶ 8; *see generally* Compl. Ex. 1.)

Consistent with the RLA, the IBT Airline Division and Defendants have established the Atlas

Air, Inc. Crewmembers' System Board of Adjustment ("Atlas Board of Adjustment") which,

pursuant to the CBA, "shall have jurisdiction over all disputes between a Crewmember and the

Company, or between the Company and the Union, growing out of the interpretation or

application of any of the terms of this Agreement or amendments thereto."  (Compl. Ex. 1,

§ 21.B.)  Atlas and the Union are currently engaged in negotiations, which began in 2016, to

amend the CBA.  (Compl. ¶ 9.)

### B.      Maintenance-Related Engine Starts

Atlas operates a fleet of aircraft to transport cargo throughout the nation and around the

world.  (Compl. ¶ 7.)  In order to service its aircraft, Atlas employs a complement of

approximately 390 Technical Operations personnel including maintenance managers.

(Declaration of M. David Citrano ("Citrano Decl.") ¶ 3.)  These managers coordinate and

oversee the work of approximately 5,600 technicians who are available to Atlas through

contracts with outside vendors.  (Citrano Decl. ¶ 3.)  Aircraft are subject to rigorous checks on a

---

[1] In addition to Atlas, IBT sues Polar Air Cargo Worldwide, Inc. ("Polar").  (*See generally* Complaint ("Compl."))
Atlas and Polar also are a single carrier for purposes of pilot collective bargaining representation under the RLA, *see
Atlas Air, Inc./Polar Air Cargo Worldwide, Inc.*, 35 NMB 259 (2008), but Atlas, and not Polar, employs the pilots
who fly for both carriers.  (*See* Declaration of Jeffrey Carlson ("Carlson Decl.") ¶ 4; Compl. ¶ 7.)  Polar does,
however, join in this motion seeking dismissal of IBT's complaint.

4

scheduled basis and also are checked by a technician while on the ground between every flight. (*Id.*)  If any maintenance issues have been identified by the incoming flight crew, and/or are discovered while the aircraft is on the ground, they are addressed by a technician.  (*Id.*)

Manuals published by the aircraft manufacturer specify that after certain maintenance has been performed on the engines or other systems of the aircraft, the engines must be started to validate that the maintenance has been performed properly and the discrepancy has been corrected.  (Citrano Decl. ¶ 4.)  While some technicians are trained and authorized to start the engine of an aircraft, the large majority are not.[2]  (*Id.*)  Thus, for over a decade, technicians who are not so trained and authorized have requested assistance from pilots working for Atlas to perform the maintenance-related engine starts.  (*Id.*)  In the large majority of cases, pilots who are requested by technicians to assist in the maintenance process have agreed to start the engines. (*Id.*)

Atlas and the airport authorities have implemented a number of safety protocols to ensure that maintenance-related engine starts are performed in a safe environment.  (Citrano Decl. ¶ 5.) For example, before a pilot can conduct a maintenance-related engine start, the technician must gain clearance from the airport authority at certain airports.  (*Id.*)  This is important because the engines of the aircraft may be pointed toward a runway or a taxiway, and the authorities will not approve the procedure until they are confident that area is clear of traffic.  (*Id.*)  Moreover, as part of their basic training, pilots are informed that an aircraft engine may never be started until the flashing red lights on the top and on the belly of the aircraft are illuminated.  (*Id.*)  Hence,

---

[2] Because of the complexity, and potential risk of causing damage to the engine, some maintenance vendors have made the business decision to not allow their technicians to conduct maintenance-related engine starts, while some vendors allow this but only for technicians with years of experience who have demonstrated great proficiency in their jobs. (Citrano Decl. ¶ 4.)  Pilots, as discussed *infra*, are trained to start engines as a part of their basic job functions.

airport personnel on the tarmac are alerted when an engine will be started for maintenance or any other purpose. (*Id.*)

In order to further ensure that maintenance-related engine starts are performed safely, Atlas utilizes ground-handling employees to work with the pilot. (Citrano Decl. ¶ 6.) Before the pilot starts the engines he is in contact by radio with a ground-handling employee who is positioned on the tarmac. (*Id.*) The ground-handling employee will inform the pilot when it is safe to start the engines and remains on the tarmac to ensure that no safety issues arise while the engines are running. (*Id.*) The ground-handling employees are fully trained in safety protocols associated with working in and around aircraft and on the tarmac of an airport. (*Id.*) Once the engines are started, the ground-handling employee remains in contact with the pilot until the engines are shut down. (*Id.*) The technician who requested the maintenance-related engine start normally remains with the pilot in the cockpit and validates his maintenance work by observing the cockpit instruments. (*Id.*)

Pilots start the aircraft engines whenever they operate a flight assignment. (Carlson Decl. ¶ 5.) Hence, they have all the training necessary to perform maintenance-related engine starts. (*Id.*) They utilize established procedures and checklists every time they start the engines for a flight, and those procedures/checklists are the same when the pilots conduct a maintenance-related engine start. (*Id.*) A pilot could not function in his or her position if he or she was not trained to safely start the aircraft engines. (*Id.*) Moreover, maintenance-related engine starts are not unique to Atlas. (Declaration of Scott Bussell ("Bussell Decl.") ¶ 7.) Pilots at other carriers similarly assist technicians by performing maintenance-related engine starts. (*Id.*) Over the course of the 10-year past practice at Atlas, there have been no accidents or harm caused by maintenance-related engine starts by pilots. (Citrano Decl. ¶ 9.) And until February 2019,

before the filing of the current complaint, the Union never claimed or informed Atlas that maintenance-related engine starts by pilots created a safety concern.  (Carlson Decl. ¶ 10.)

In the past, some pilots have, on an individual-choice basis, declined to perform a maintenance-related engine start when requested by a technician.  (Citrano Decl. ¶ 7.)  This has not occurred frequently, but when it does, an Atlas maintenance manager must find a technician who is authorized to start the engines.  (*Id.*)  Depending on the location and time of day, this may take hours.  (*Id.*)  Atlas flies to many remote locations around the world, and it may be required to transport a technician from another airport to assist with the engine start.  (*Id.*)  Because Atlas relies on the long-term past practice of its pilots voluntarily to perform maintenance-related engine starts when requested to do so by a technician, if pilots were to decline to perform such engine starts on a concerted (rather than individual) basis, Atlas would almost certainly suffer flight delays that could easily have been avoided.  (*Id.*)

Pilots who perform maintenance-related engine starts are compensated for their efforts. (Carlson Decl. ¶ 6.)  Pursuant to the Atlas CBA, pilots must report for duty an hour-and-a-half prior to their scheduled flight departure time.  (*Id.*)  During this pre-flight period, among other things, pilots perform duties such as checking the weather for their flight path, conducting a visual inspection of the aircraft, reviewing the amount of fuel loaded for the flight, programing computers in the cockpit and completing various pre-flight checklists.  (*Id.*)  Thus, in the normal course of their assignment, pilots arrive at the aircraft and are in the cockpit well before scheduled departure time.  (*Id.*)  It is during this period of pre-flight preparation, when a pilot is

in the aircraft performing pre-flight duties, that he or she may be asked by a technician to start the engines.[3]  (*Id.*)

### C.    <u>Evidence of Past Practice</u>

Pursuant to regulations promulgated by the Federal Aviation Administration ("FAA"), Atlas keeps detailed electronic and paper records of all maintenance preformed on each of its aircraft.  (Bussell Decl. ¶ 3.)  One such record is referred to as an "Aircraft Log."  (*Id.*)  The Aircraft Log is a pre-printed form that is filled out by a technician prior to every flight.  (*Id.*)  The technician describes any maintenance performed while the aircraft is on the ground, and certifies through his or her signature that the aircraft is airworthy and ready for flight.  (*Id.*)  The captain assigned to operate the aircraft must review and sign the Aircraft Log before the flight departs.  (*Id.*)

By searching its maintenance database, Atlas has located 49 Aircraft Logs since 2013 showing that pilots performed maintenance-related engine starts upon request of maintenance technicians.  (Bussell Decl. ¶ 6; Ex. 2.)  Because the database does not track maintenance-related engine starts as such, it is highly likely that there are even more instances in which pilots assisted technicians by starting the engines.  (Bussell Decl. ¶ 6.)  The fact that pilots have conducted maintenance-related engine starts for years is further confirmed by the Atlas General Maintenance Manual ("GMM").  (Bussell Decl. ¶ 4; Ex. 1.)  Section 8.7.1 of the GMM provides that "[m]aintenance must make a logbook entry when engine runs are performed by a crew

---

[3] Under the Atlas CBA, pilot pay is determined largely by the number of "block hours" flown each month.  (Carlson Decl. ¶ 7.)  Block hours are measured from the moment the aircraft begins to back away from the departure gate to the moment the pilots sets the brake at the arrival gate.  (*Id.*)  The CBA also compensates pilots in other ways.  (*See generally* Compl. Ex. 1.)  For example, pilots are paid premiums for performing certain identified functions, are guaranteed pay for a minimum number of block hours each month regardless of actual hours flown and receive per diem allowances.  (*See, e.g.*, Compl. Ex. 1 §§ 3.A.1.d.i, 3.B, 5.A.)  As noted above, pursuant to this compensation system, pilots are required to report for duty at the airport an hour-and-a-half prior to scheduled departure time (and they remain on duty for 30 minutes after the flight arrives at its destination).  (*Id.* § 12.B.)

member instead of maintenance personnel." (Bussell ¶ 4, Ex. 1 § 8.7.1.) Atlas would have no reason to create a procedure for maintenance-related engine starts performed by pilots unless pilots were actually starting the engines at the request of technicians. (*Id*. ¶ 4.)

**D.     Operations Bulletins 19-01 and 19-04**

On February 1, 2019, Atlas published Operations Bulletin 19-01 ("OB 19-01") entitled "Engine Start Guidelines." (Carlson Decl. ¶ 8; Compl. ¶ 10; Compl. Ex. 2.) By its terms, OP 19-01 provides "guidance" for pilots to follow when they are "requested by maintenance to conduct an engine start," including that the engine should not be run at anything greater than "idle power." (Carlson Decl. ¶ 8; Compl. Ex. 2.) Contrary to the allegations in the Union's complaint, nothing in OB 19-01 "requires" or "forces" pilots to perform maintenance-related engine starts when requested to do so by a technician. (Carlson Decl. ¶ 8; *compare* Compl. ¶ 22.)

Atlas clarified this point on March 11, 2019, when it issued Operations Bulletin OB 19-04 ("OB 19-04"), entitled "Clarification on Operations Bulletin OB 19-01 Engine Start Guidelines." (Carlson Decl. ¶ 9.) OB 19-04 expressly states that "OB19-01 was not intended and does not require that pilots preform engine starts when requested by maintenance. A pilot's decision whether to perform such an engine start is voluntary." (*Id.*) Thus, contrary to the allegations in the complaint, there can be no doubt that Atlas does not "require" pilots to conduct maintenance-related engine starts.

**E.     The Court's November 30, 2017 Preliminary Injunction**

On September 25, 2017, Atlas filed a complaint against the Union seeking injunctive relief. *See* Complaint, *Atlas Air, Inc., et al., v. Int'l Bhd. of Teamsters*, *et al.,* 1:17-cv-01953 (D.D.C. Sept. 25, 2017), ECF No. 1. Atlas alleged that IBT was violating Section 2, First, of the

RLA, 45 U.S.C. § 152, First, by directing pilots to engage in a slowdown.  (*Id.*)  Atlas alleged

that as part of the slowdown, the Union, on a concerted basis, had encouraged pilots not to

volunteer for open time flying assignments they had covered in the past and not to voluntarily

depart early when the aircraft was loaded and ready to go.  (*Id.*)  After hearing three days of

evidence, and receiving extensive briefing from the parties, the Court agreed with Atlas and held

that IBT had violated Section 2, First.  *See Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp.

3d 59 (D.D.C. 2017).  In its opinion supporting the injunction, the Court recognized that, in the

context of a labor dispute, phrases such as "work safe" were code words for an illegal slowdown

campaign, as recognized in the case law under Section 2, First of the RLA.  *Id*. at 91.

On November 30, 2017, the Court issued a preliminary injunction, which, among other

things, prohibits the Union from "authorizing, encouraging, permitting, calling, engaging in, or

continuing any strike, work stoppage, sick out, [or] concerted refusal to volunteer for or accept

work assignments."  *See* Order, *Atlas Air, Inc., et al., v. Int'l Bhd. of Teamsters, et al.,* 1:17-cv-

01953 (D.D.C. Nov. 30, 2017), ECF No. 60.  The circumstances under which this injunction was

issued have not changed – the parties continue to be engaged in the same collective bargaining

process that was the subject of the preliminary injunction hearing.  (Carlson Decl. ¶ 2.)

### F.    The Current Dispute

The Union filed the instant complaint on March 7, 2019, seeking injunctive and

declaratory relief.  (*See* Compl. ¶¶ 28-49.)  In its complaint, the Union alleges that Atlas has

created a major dispute under the RLA by unilaterally changing the status quo terms of

employment for pilots.  (*See id*. ¶ 26.)  On that basis, the Union alleges that it is entitled to an

injunction to prohibit Atlas from allowing technicians to ask pilots to perform maintenance-

related engine starts, and a declaratory judgement that the Union may institute a major dispute

strike in response to Atlas' alleged change in the status quo, including directing pilots to discontinue performing maintenance-related engine starts, without violating this Court's November 30, 2017, injunction against the Union's illegal slowdown.  (*See id*. ¶¶ 43, 49.) The Union relies on cases purportedly permitting a major dispute strike in response to a status quo violation "until the Act [RLA] is complied with by the Carrier."  (*Id*. ¶ 47.)

## ARGUMENT

### I.   STANDARD FOR DISMISSING A CLAIM UNDER RULES 12(B)(1) AND 12(B)(6)

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction.  Because the burden to establish jurisdiction is at all times on the Plaintiff, the allegations in the complaint are entitled to no presumption of truthfulness under Rule 12(b)(1). *Bhd. of Maint. of Way Emps. Div./IBT v. Nat'l R.R. Passenger Corp.*, 217 F. Supp. 3d 249, 255 (D.D.C. 2016); *see also Bhd. of R.R. Signalmen v. Nat'l R.R. Passenger Corp.*, 310 F. Supp. 3d 131, 137 (D.D.C. 2018).  The Court must scrutinize the allegations more closely than it would under Rule 12(b)(6), and in deciding whether it has jurisdiction the Court may consider evidence extrinsic to the complaint.  *Bhd. of Maint. of Way Emps.*, 217 F. Supp. 3d at 255; *Bhd. of R.R. Signalmen*, 310 F. Supp. 3d at 137.

A motion to dismiss pursuant to Rule 12(b)(6), on the other hand, challenges the sufficiency of a complaint as failing to allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible if the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Spiller v. D.C.*, 2019 WL 689778, at \*2 (D.D.C. Feb. 19, 2019) (Moss, J) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Ibrahim v. Mid-Atlantic Air of DC, LLC*, 802 F. Supp. 2d 73, 75 (D.D.C. 2011).

The facial plausibility standard is not a "probability requirement" but mandates "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations and citations omitted).  In order to survive a motion to dismiss, a plaintiff must allege sufficient factual content to "nudge[]" his claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *see also Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

For the reasons discussed below, the Union cannot establish subject matter jurisdiction for purposes of Rule 12(b)(1) and has failed to plausibly state a claim for purposes of Rule 12(b)(6).

## II.   PLAINTIFFS' CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF SHOULD BE DISMISSED UNDER RULE 12(B)(1) BECAUSE THEY RAISE MINOR DISPUTES OUTSIDE THE SUBJECT MATTER JURISDICTION OF THE COURT

This action is governed by the RLA, the principal purpose of which is to avoid interruptions to commerce.  *Detroit & T. S. L. R.R. v. United Transp. Union*, 396 U.S. 142 (1969).  To achieve this statutory purpose, the RLA provides that air carriers and their employees are obligated "to exert every reasonable effort to make and maintain agreements . . . and to settle all disputes, whether arising out of the application of such agreement or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."  45 U.S.C. § 152, First.

The role of the federal courts in enforcing this obligation depends on whether the dispute in question is characterized as "major" or "minor."  Major disputes are those over the "formation of collective agreements or efforts to secure them.  They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an

12

existing agreement controls the controversy." *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 723 (1945). For major disputes, the RLA sets forth a detailed negotiation and mediation process. 45 U.S.C. §§ 155, 156. While the parties ultimately are free to exercise self-help, they must maintain the "status quo" until the negotiation and mediation procedures are exhausted. *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378 (1969). In a major dispute, the status quo requirement under Section 2, First of the RLA prevents the union from striking or engaging in other job actions and management from changing the rates of pay, rules or working conditions related to the dispute. *Id.* Moreover, in a major dispute, the parties' obligations to maintain the status quo are enforceable, by injunction, in the federal courts. *Bhd. of Ry. & S.S. Clerks, Freight Handlers, Express & Station Emps. v. Fla. E. Coast Ry.*, 384 U.S. 238, 246 (1966).

Minor disputes, on the other hand, are those which concern grievances or matters, the resolution of which require the interpretation or application of existing collective bargaining agreements. *Elgin*, 325 U.S. at 722-23. For minor disputes, the RLA requires the parties to submit the contract interpretation issues to the appropriate board of adjustment for final and binding arbitration. 45 U.S.C. § 153. The Supreme Court has repeatedly held that the jurisdiction of the appropriate adjustment board is "mandatory, exclusive and comprehensive." *E.g., Andrews v. Louisville & Nashville R.R.*, 406 U.S. 320, 322-24 (1972); *Bhd. of Locomotive Eng'rs v. Louisville & Nashville R.R.*, 373 U.S. 33, 36-38 (1963); *Pennsylvania R.R. v. Day*, 360 U.S. 548, 551-54 (1959). In a minor dispute, there is no obligation on the part of the carrier to maintain the status quo. *Conrail*, 491 U.S. at 304 (The Supreme Court "never has recognized a general statutory obligation on the part of an employer to maintain the status quo pending the Board's decision" on a minor dispute).

The Supreme Court has ruled that carriers bear a "relatively light burden" in establishing that a dispute is minor and therefore subject to mandatory arbitration.  *Id*. at 307.  "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major."  *Id*. at 307, 310.  Courts have held that the burden of establishing a minor dispute is so light that any doubt should be resolved in favor of finding a dispute to be minor.  *See, e.g., Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc.,* 869 F.2d 1518, 1524 (D.C. Cir. 1989); *Bhd. of Maint. of Way Emps. v. Burlington N. Santa Fe R.R.*, 270 F.3d 637, 639 (8th Cir. 2001); *Ry. Labor Exec. Ass'n v. Norfolk & W. Ry.*, 833 F.2d 700, 705 (7th Cir. 1987); *Bhd. of R.R. Signalmen*, 310 F. Supp. 3d at 138.  Indeed, "few disputes that arise during the term of a collective bargaining agreement cannot arguably be resolved by reference to the agreement."  *E. Air Lines*, 869 F.2d at 1522.

In *Conrail*, the employer had an established practice of requiring its employees to undergo physical examinations periodically and upon return from a leave of absence.  Although drug testing was conducted as a part of the exams only in limited circumstances, the employer decided that all such physical exams would include a test for drugs.  The collective bargaining agreement between the parties did not address the issue of physical exams or drug testing during such exams.  *Conrail*, 491 U.S. at 311.  The employer based its right to impose drug testing "solely upon implied contractual terms, as interpreted in light of past practice."  *Id*. at 312.  The unions representing the affected employees agreed that due to the long-term past practice of the parties, the employer's right to conduct physical exams had become an implied term of the

collective bargaining agreement, but claimed that the drug testing was an unlawful change in the status quo, *i.e.*, a major dispute under the RLA.  *Id*.

The Supreme Court rejected the union's claim, holding that the dispute was minor because the newly-imposed drug testing was "arguably justified" by the implied terms of the collective bargaining agreement.  The Court based its ruling on the employer's past practice of conducting physical exams and imposing periodic changes to those exams, including some drug testing, without objection from its unions.  *Id*. at 313, 317-20.  Consistent with *Conrail*, this Circuit has held that in situations involving "implied agreements or unstated terms . . . there is a strong presumption that a dispute is minor."  *E. Air Lines*, 869 F.2d at 1521-22.  Courts may only "peek at the merits of a party's contractual justification" to determine whether the dispute in question is minor.  *Id*. at 1521.[4]

**A.**      **Plaintiffs' Request for Injunctive Relief Should Be Denied Because Allowing Pilots To Perform Maintenance Related Engine Starts Voluntarily Is At The Very Least Arguably Justified By The CBA as Interpreted in Light of Past-Practice**

While the CBA does not address the issue expressly, Atlas has an implied right under the CBA, based on many years of past-practice, to allow its technicians to request that pilots perform maintenance-related engine starts voluntarily.  *See e.g.*, *Conrail*, 491 U.S. at 313, 317-20; *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R.*, 879 F.3d 754 (7th Cir. 2017) (finding minor dispute where past practice arguably supplied an implied contractual term); *Airline Prof'ls Ass'n of the Int'l Bhd. of Teamsters v. ABX Air, Inc.*, No. 00-4109, 2001 WL 1609934, at *4 (6th Cir. Dec. 31, 2001) ("[c]onsidering these past practices, ABX's decision to unilaterally revise the

---

[4] Courts in this Circuit have applied the *Conrail* standard on many occasions to find that disputes between a union and a carrier were minor disputes subject to mandatory arbitration.  *See Bhd. of Maint. of Way Emps.*, 217 F. Supp. 3d at 258, 261; *Bhd. of R.R. Signalmen*, 310 F. Supp. 3d at 141; *IBT/HERE Emp. Representatives Council v. Gate Gourmet Div. Americas*, 377 F. Supp. 2d 54, 60-61 (D.D.C. 2005).

FOM was 'arguably justified'").  Atlas has submitted compelling evidence in the form of 49

Aircraft Log entries, and equally compelling testimony from maintenance and flight operations

personnel, that pilots have a long-standing practice of performing maintenance-related engine

starts when requested to do so by a technician.  (*See* Bussell Decl. ¶ 6, Ex. 2; Citrano Decl. ¶ 4;

Carlson Decl. ¶ 10.)  This past practice is further confirmed by the fact that Atlas has

incorporated a procedure in its GMM expressly requiring that maintenance-related engine starts

be recorded in the Aircraft Log.  (*See* Bussell Decl. ¶ 4.)  If pilots were not conducting

maintenance-related engine starts, there would be no reason for Atlas to include the procedure in

its GMM.  On the basis of this evidence, Atlas easily satisfies the "arguably justified" standard of

*Conrail* and *Eastern Airlines*.  *See Bhd. of Locomotive Eng'rs & Trainmen*, 879 F.3d at 759

(holding that "[t]he Railroad's declaration is enough to show that its position is not frivolous,

though it may or may not prevail.  Wading through the competing declarations to determine the

actual authority the Railroad had to modify the disciplinary policies, based on past practice, is a

job for the arbitrator.")

      Because pilots have performed maintenance-related engine starts for an extended period

of time, Atlas has come to rely on this practice.  (*See* Citrano Decl. ¶ 7.)  While pilots have the

right, on an individual basis, to decline a technician's request to perform a maintenance-related

engine start, IBT does not have the right to direct pilots not to perform this function on a

concerted basis with the effect of disrupting Atlas' operation and exerting pressure in the course

of the current collective bargaining between the parties.  *Delta Air Lines, Inc. v. Air Line Pilots

Ass'n, Int'l,* 238 F.3d 1300, 1307-09 (11th Cir. 2001); *United Air Lines, Inc. v. Air Line Pilots

Ass'n Int'l*, No. 08 cv 4317, 2008 WL 4936847, at *40 (N.D. Ill. Nov. 17, 2008).

In Counts I, II and III for injunctive relief, IBT alleges that OB 19-01 constitutes a unilateral change to the status quo working conditions and terms of employment because maintenance-related engine starts do not fit within the definition of "Work" as that term is used in the CBA.[5]  (*See* Compl. ¶ 11.)  IBT also alleges in its complaint that "[t]hrough the recent unilateral issuance of OB-19-01 . . .  [Atlas has] imposed a requirement on pilots to operate an aircraft for purposes other than flight or taxi movement without corresponding compensation."[6] (*Id.* ¶ 19.)  The Union further contends that pilots are not trained to conduct maintenance-related engine starts, and that such engine starts are unsafe when conducted by pilots.  (*Id.* ¶¶ 16-18, 22-24.)  These allegations do not come close to satisfying the Union's heavy burden in establishing a major dispute.

The Union cannot establish a major dispute by arguing that maintenance-related engine starts are not "work" under the CBA, and represent a change in the status quo, because Atlas has submitted admissible evidence that the parties have impliedly agreed – through an established past practice over many years – that pilots may perform maintenance-related engine starts upon request of a technician.  (*See* Bussell Decl. ¶ 6, Ex. 2; Citrano Decl. ¶ 4; Carlson Decl. ¶ 10.) This same past practice disposes of any argument that Atlas has changed the status quo and created a major dispute with respect to pilot compensation.  Not only have pilots performed maintenance-related engine starts for many years without raising any issue about compensation, the evidence shows that pilots are requested to perform maintenance-related engine starts during the 90-minute period prior to their scheduled flight when they are required by the CBA to be on

---

[5] "Work" is defined in Section 2 of the CBA to "include a flight assignment, a deadhead assignment, reserve, layover or training (other than home-based training)."  (*See* Compl. Ex. 1 § 2(II).)  However, the definition of "work" is not exclusive and Atlas pilots routinely perform additional duties than those contained in the definition of "work," such as their pre-flight duties.  (*See* Carlson Decl. ¶ 6.)

[6] The Union acknowledges that Atlas may require pilots to taxi aircraft under the CBA.  (Compl. ¶ 20.)

duty.  (*See* Carlson Decl. ¶ 6.)  Accordingly, it is not "frivolous" or "obviously insubstantial" for Atlas to take the position that maintenance-related engine starts are impliedly permitted under the CBA and that pilots are compensated for their labor.  *Conrail*,  491 U.S. at 307, 310.

The Union's argument that pilots are not trained to perform maintenance-related engine starts, and that they present a danger to safety, likewise does not create a major dispute.  First, the Union's allegations concerning the danger to ground personnel and equipment attendant to maintenance-related engine starts say nothing about the permissibility of such engine starts under the implied terms of the CBA as interpreted through past practice.  Second, pilots are indisputably trained to start the engines of an aircraft because they must do so in order to fly the airplane.  (*See* Carlson Decl. ¶ 5.)  Maintenance-related engine starts follow the exact same procedures, and pilots use the same checklists, as when they start the engines to initiate flight. (*Id.*)  Indeed, OB-19-01 expressly states that pilots are to "Follow all Normal Before Start, Start, Shutdown, and After Shutdown Procedures and Checklists."  (Compl. Ex. 2.)

Furthermore, OB 19-01 applies only when a pilot is "requested by maintenance" to perform a maintenance-related engine start, and only when a technician and ground handling employees have concluded that it is safe to do so.  (*See* Compl. Ex. 2.)  The question is not whether the engines will be started.  The only question is who will start them.  The procedure is coordinated with airport authorities to ensure safety:  lights on the aircraft are illuminated to inform airport personnel that the engines will start and a trained ground employee watches the area and remains in contact with the pilot at all times.  (Citrano Decl. ¶¶ 5-6.)  Pilots have been performing this task for many years, and the Union does not allege a single instance in which safety at Atlas has been compromised, or in which any damage has been suffered by a person or

thing, because a pilot performed a maintenance-related engine start at the request of a maintenance technician.[7]  (*See also* Citrano Decl. ¶ 9.)

It is noteworthy that the FAA has promulgated a multitude of regulations governing the operations at airports across the country.  *See, e.g.* 14 C.F.R. § 139.305 (regulating paved areas of runways and taxiways); 14 C.F.R. § 139.311 (regulating marking, signs, and lighting of airport taxiways and runways).  These regulations cover, among other things, activity of aircraft and ground vehicles in and around taxiways and runways.  *See* 14 C.F.R. § 139.329 (regulating pedestrians and ground vehicles); 14 C.F.R. § 135.100 (regulating "critical phases of flight [that] includes all ground operations involving taxi . . . and all other flight operations conducted below 10,000 feet").  Despite this regulation, and the custom in the industry of pilots conducting maintenance-related engine starts, the FAA has not prohibited or curtailed pilots from engaging in maintenance-related engine starts of the type involved here.  If the FAA determined that this was an unsafe procedure as alleged by the Union, it would have so indicated in its regulations.  Courts should certainly not be asked to make safety determinations that Congress has expressly relegated to the FAA.  *See Air Line Pilots Ass'n v. United Air Lines, Inc.*, Case 1:11-cv-04661-SJ-SMG (E.D.N.Y. Sept. 29, 2011) (in the course of denying a union's requested major dispute restraining order regarding the use of new flight manuals in the cockpit, the court held that "there is nothing in ALPA's submissions to support a finding that the FAA has somehow been negligent in carrying its regulatory mandate, or to suggest that the agency's oversight and/or conduct .  .  . is outside the orbit of deference it is entitled to.").

---

[7] The Union appears to allege that maintenance-related engine starts are unsafe because the aircraft has not yet been certified by a technician as airworthy.  (Compl. ¶¶ 13-15.)  A pilot conducting a maintenance-related engine start, however, is not starting the engines in order to fly the aircraft.  (Carlson Decl. ¶ 11.)  He is starting the engines so that the technician can certify the aircraft as airworthy and the pilot can thereafter operate the aircraft in flight.  (*Id.*)

**B.** **Plaintiffs' Request For Declaratory Relief Should Be Denied Because Allowing Pilots To Perform Maintenance-Related Engine Starts Is At The Very Least Arguably Justified By The CBA as Interpreted in Light of Past Practice And Because It Would Conflict With This Court's Injunction**

On November 30, 2017, this Court issued a preliminary injunction prohibiting an unlawful slowdown conducted by the Union. *See Atlas Air*, 280 F. Supp. 3d at 106. The Union now alleges that it has the right to conduct a major dispute strike based on a demonstrably inaccurate allegation that Atlas has changed the status quo working conditions and terms of employment by issuing a bulletin on February 1, 2019 "requiring" and "forcing" pilots to perform maintenance-related engine starts. (*See* Compl. ¶¶ 1, 10.) Relying on cases purportedly permitting a union to initiate a major dispute strike when a carrier changes the status quo (until the status quo is restored), the Union seeks a declaratory judgment that it may initiate a major dispute strike, including the right to "communicate with [its] pilot members that they need not accept such unsafe assignments," "advise the pilots employed by Defendants not to perform maintenance-related Engine Runs" and "advise the pilots that they have [a] contractual right not to perform any action that they reasonably believe . . . would result in substantial and imminent risk to them or their equipment" and to refuse unsafe work – all without violating Section 2, First of the RLA and this Court's injunction. (*See* Compl. Prayer For Relief, §§ B, C.)

The Union's request for declaratory relief should be rejected. For the reasons discussed above, the disagreement in this case over whether pilots may be asked by technicians voluntarily to perform maintenance-related engine starts raises a minor dispute within the exclusive jurisdiction of the Atlas Board of Adjustment – not a major dispute as alleged by the Union. Thus, the purported legal predicate for the requested declaratory judgment – a status quo

violation by Atlas – does not exist here.  This Court therefore does not have jurisdiction to issue the requested declaratory judgment.[8]

The Union's reliance in its complaint on Section 26.R of the CBA does not alter this result.  (Compl. ¶ 48.)  Section 26.R provides that "[n]othing in this Agreement will be construed to require a Crewmember to take any action if he reasonably believes that such action will result in substantial and imminent risk of harm to the Crewmember or his equipment."  (Compl. Ex. 1 § 26.R.)  On its face, Section 26.R does not authorize the Union to encourage pilots on a concerted basis to stop engaging in voluntary activity they have been performing for many years.  Quite the opposite.  Section 26.R permits an individual pilot, acting on her own accord, to refuse an assignment only where she believes there is "a substantial and imminent risk of harm."  (*Id.*)  Thus, Section 26.R provides IBT with no contractual basis for a declaratory judgment allowing the Union to advise pilots, on a concerted basis, not to conduct maintenance-related engine starts and to "refuse unsafe work."  And to the extent there is any conceivable disagreement regarding the plain language of Section 26.R of the CBA, such disagreement constitutes a minor dispute for the exclusive arbitration jurisdiction of the Atlas  Board of Adjustment.

The Union's invocation of safety concerns also does not change the result.  Until approximately February 2019, shortly before filing this lawsuit, the Union never before claimed that the maintenance-related engine starts by pilots create a safety risk.  (*See* Carlson Decl. ¶ 10.)  The Union's safety allegations now, after a ten-year past practice where there have been no accidents or harm caused by maintenance-related engine starts by pilots, are not plausible and

---

[8] Under the case relied upon by the Union in its complaint, the right to engage in a major dispute strike ceases once the carrier restores the status quo.  (Compl. ¶ 47; *see Atlanta & W. Point R.R. v. United Transp. Union*, 439 F.2d 73, 80 (5th Cir. 1971). Here, if the Court were to issue the requested injunction, the legal predicate for the Union's declaratory judgement request would no longer exist because the status quo would be restored.  Thus, the Union's request for both an injunction and a declaratory judgment cannot possibly be sustained.

cannot be credited.  As this Court held in issuing its November 2017 injunction, and as other

courts have held in the past, phrases like "work safe" are, in the context of a labor dispute,

frequently code for slowing down an airline in an effort to gain leverage in collective bargaining

in violation of Section 2, First of the RLA.  *Atlas Air*, 280 F. Supp. 3d at 91; *see also United Air*

*Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 272 (7th Cir. 2009); *United Air Lines,*

*Inc. v. Int'l Ass'n of Machinists & Aerospace Workers,* 243 F.3d 349, 366-67 (7th Cir. 2001).

That should not be permitted here.

In issuing the November 2017 injunction, this Court ruled that IBT was engaged in an

illegal slowdown by encouraging pilots to stop certain activities that were voluntary on an

individual basis but that pilots had performed for many years (e.g., open time flying and blocking

out early).  *Atlas Air*, 280 F. Supp. 3d at 95-98, 98-102.  IBT is now seeking permission from the

Court to engage in the same type of slowdown activity that was previously enjoined – it wants to

direct pilots on a concerted basis, under the pretext of safety, to discontinue a practice that is

voluntary but which the pilots have been performing for years, and on which Atlas has relied to

operate its flights on a timely basis.  Because the Court has previously found that such concerted

activity by IBT disrupts operations in violation of Section 2, First of the RLA, and because the

Union can show no arguable justification in the CBA or the RLA for the declaratory judgment it

seeks, the Union's request for declaratory relief should be denied and its claim should be

dismissed.

III.   **PLAINTIFFS' CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF SHOULD BE DISMISSED UNDER RULE 12(B)(6) BECAUSE THEY FAIL TO PLAUSIBLY STATE CLAIMS FOR RELIEF**

In its complaint, IBT alleges that Atlas has unilaterally changed the status quo "terms and

conditions of employment" and "working conditions" for pilots in violation of Section 6 and

Section 2, Seventh of the RLA.  (Compl. ¶¶ 1, 34, 37.)  In support of this allegation, the Union

falsely contends that by issuing OB-19-01, Atlas is "ordering that pilots perform Engine Starts"

and "requiring pilots to conduct maintenance worker functions."  (*Id*. ¶ 10; *see also id*. ¶¶ 19,

22.)  IBT further inaccurately contends, again on the basis of OB 19-01, that Atlas is "now

forcing said pilots to perform Engine Starts."  (*Id*. ¶ 1.)  According to the Union, this alleged

change in the status quo terms of employment creates a major dispute under the RLA, entitling

the Union to injunctive relief prohibiting Atlas from allowing its technicians to ask pilots to

perform maintenance-related engine starts, and to declaratory relief permitting the Union to

instigate a major dispute strike and to "advise the pilots employed by Defendants not to perform

maintenance-related Engine Runs" without violating the Court's November 2017 injunction.

(Compl. Prayer for Relief, § C.)

        Assuming *arguendo* that this Court determines it has jurisdiction, the Union's claims

should be dismissed for failure to state a claim under Rule 12(b)(6) because they all rely on the

same demonstrably false allegation that OB 19-01 altered the status quo terms of employment by

"requiring" and "forcing" pilots to perform maintenance-related engine starts.[9]  Contrary to the

Union's allegations, however, absolutely nothing in OB 19-01 conceivably "requires" or

"forces" pilots to perform maintenance-related engine starts.  On its face, OB 19-01 only sets

forth "Guidelines" for pilots who are "requested by maintenance to conduct an engine start."

(*See* Compl. Ex. 2.)  Because the Union's allegations of a change to the pilots' terms of

employment all rely on the inaccurate and unsupportable assertion that OB 19-01 is "forcing" or

"requiring" pilots to conduct maintenance-related engine starts, those allegations are implausible

---

[9] The Court may consider OP 19-01 in deciding a motion under Rule 12(b)(6) because it is referenced and relied upon in the complaint and attached as an exhibit.  *Page v. Mancuso*, 999 F. Supp. 2d 269, 275 (D.D.C 2013); *W. Wood Preservers Inst. v. McHugh*, 292 F.R.D. 145, 149 (D.D.C. 2013).

and should be dismissed with prejudice.  *See Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir.

2004) ("Nor must we accept as true the complaint's factual allegations insofar as they contradict

exhibits to the complaint or matters subject to judicial notice"); *Rivera v. Rosenberg & Assocs.,*

*LLC*, 142 F. Supp. 3d 149, 161 (D.D.C. 2015) ("Where, as here, the complaint's factual

allegations are contradicted by exhibits incorporated by reference in the complaint and of which

the Court may take judicial notice, the Court need no longer accept as true plaintiff's version of

events.").

 After publishing OB 19-01, Atlas issued another bulletin, OB 19-04, entitled

"Clarification on Operations Bulletin OB-19-01 Engine Start Guidelines," confirming irrefutably

that maintenance-related engine starts are voluntary.  (Carlson Decl. ¶ 9.)  In OB 19-04, Atlas

stated that "OB 19-01 was not intended to and does not require that pilots perform engine starts

when requested by maintenance.  A pilot's decision whether to perform such an engine start is

voluntary."  (*Id.*)  The Court may consider OB-19-04 on this motion because, in alleging that

Atlas was "forcing" and "requiring" pilots to conduct maintenance-related engine starts, IBT

necessarily must rely on all of the policy documents governing that procedure.  *See Hinton v.*

*Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 47 (D.D.C. 2009) ("By pleading that defendant had a

duty to provide him with eye treatment and care, the plaintiff's complaint necessarily rests on the

contract, although it did not incorporate the contract.")[10]  Indeed, the title of OB 19-04,

referencing a "clarification of OB 19-01," demonstrates that the two documents must necessarily

be read together.  (Carlson Decl. ¶ 9.)

---

[10] If the Court concludes that it may not consider OP 19-04 for purposes of a motion to dismiss under Rule 12(b)(6), it should convert this motion to one for summary judgment and dismiss the Union's claims on the ground that the maintenance-related engine starts are indisputably voluntary.  *Mancuso*, 999 F. Supp. 2d at 275-76.

The complaint also must be dismissed for failure to state a claim because Atlas could not possibly violate the pilots' status quo terms of employment or working conditions under the RLA by implementing a purely voluntary maintenance-related engine start procedure for individual pilot choice.  As one court has held in denying a union's request for a major dispute injunction under the RLA, "[b]ecause voluntary testing would involve individual decisions made freely by individual employees, by no stretch of the imagination could this be construed to be a change in working conditions." *S. Pac. Transp. Co.*, 1980 WL 2170, at \*4.  For this additional reason, the complaint does not plausibly state a claim and should be dismissed.

## **CONCLUSION**

For the reasons discussed above, the Court should dismiss all claims with prejudice.

Dated:   April 1, 2019
         Washington, D.C.

Respectfully submitted,

By:    /s/ Robert A. Siegel
     Robert A. Siegel
     (D.C. Bar #1004474)
     Michael G. McGuinness
     (*pro hac vice* pending)

     O'MELVENY & MYERS LLP

     1625 Eye Street, NW
     Washington, D.C. 20006
     Telephone:  (202) 383-5300
     Facsimile:  (202) 383-5414
     rsiegel@omm.com

     400 South Hope Street
     Los Angeles, California 90071
     Telephone:  (213) 430-6000
     Facsimile:  (213) 430-6407
     mmcguinness@omm.com

     *Attorneys for Defendants*