**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION; and AIRLINE PROFESSIONALS ASSOCIATION OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION NO. 1224, <br><br>            Plaintiffs, <br> v. <br><br> ATLAS AIR, INC. and POLAR AIR CARGO WORLDWIDE, INC., <br><br>            Defendants. | Civil Action No. 1:19-CV-00651-RDM |

## REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT UNDER RULES 12(B)(1) AND 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................... 5

    I.    THE UNION'S CLAIMS FOR INJUNCTIVE RELIEF SHOULD BE DISMISSED UNDER RULE 12(B)(1) BECAUSE THEY RAISE MINOR DISPUTES ................................................................................................ 5

    II.    THE UNION CANNOT ESTABLISH A MAJOR DISPUTE UNDER THE RLA BY ARGUING THAT MAINTENANCE-RELATED ENGINE STARTS ARE UNSAFE, OR THAT PILOTS ARE NOT TRAINED TO PERFORM MAINTENANCE RELATED ENGINE STARTS ............................................................................................................ 13

    III.    THE UNION'S CLAIM FOR DECLARATORY RELIEF SHOULD BE DENIED UNDER RULE 12(B)(1) BECAUSE IT RAISES A MINOR DISPUTE AND BECAUSE IT WOULD CONFLICT WITH THIS COURT'S INJUNCTION ......................................................................................... 19

    IV.    THE UNION DOES NOT PROVIDE ANY VALID REASON WHY ITS CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF SHOULD NOT BE DISMISSED UNDER RULE 12(B)(6) .............................. 22

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Line Pilots Ass'n v. Trans World Airlines*, *Inc.*,
    729 F. Supp. 888 (D.D.C. 1989) .......................................................................... 12

*Air Line Pilots Ass'n v. United Air Lines, Inc.*,
    No. 11 CV 4461 SJ, 2011 WL 4543820 (E.D.N.Y. Sept. 29, 2011) ....................... 14

*Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc.*,
    863 F.2d 891 (D.C. Cir. 1988) ............................................................................... 6

*Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc.*,
    869 F.2d 1518 (D.C. Cir. 1989) .................................................................. 5, 6, 20

*Air Line Pilots Ass'n, Int'l v. Trans World Airlines, Inc*,
    713 F.2d 940 (2d Cir. 1983), *rev'd on other grounds Trans World Airlines, Inc. v. Thurston*,
    469 U.S. 111 (1985) ............................................................................................. 14

*Airline Prof'ls Ass'n of the Int'l Bhd. of Teamsters v. ABX Air, Inc.*,
    No. 00-4109, 2001 WL 1609934 (6th Cir. Dec. 31, 2001) ..................................... 6

*Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv*.,
    297 F. Supp. 2d 165 (D.D.C. 2003) ...................................................................... 24

*Atlas Air*, *Inc. v. Int'l Bhd. of Teamsters*,
    280 F. Supp. 3d 59 (D.D.C. 2017) ........................................................................ 21

*Baptist Mem'l Hosp. v. Johnson*,
    603 F. Supp. 2d 40 (D.D.C. 2009) ........................................................................ 12

*Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R.*,
    879 F.3d 754 (7th Cir. 2017) ........................................................................... 6, 12

*Bhd. of Maint. of Way Employees Div./IBT v. Norfolk S. Ry. Co.*,
    2012 WL 4461690 (N.D. Ill. Sept. 25, 2012), *aff'd*, 745 F.3d 808 (7th Cir. 2014) ................. 12

*Bhd. of Maint. of Way Emps. v. Burlington N. Santa Fe R.R.*,
    270 F.3d 637 (8th Cir. 2001) ................................................................................. 5

*Bhd. of R.R. Signalmen v. Nat'l R.R. Passenger Corp.*,
    310 F. Supp. 3d 131 (D.D.C. 2018) ........................................................................ 5

*Brookens v. United States*,
    981 F. Supp. 2d 55 (D.D.C. 2013) ........................................................................ 22

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Consol. Rail Corp. v. Railway Labor Executives' Ass'n*,
491 U.S. 299 (1989).............................................................................................. 5, 6, 11

*Dawn J. Bennett Holding, LLC v. FedEx TechConnect, Inc*.,
217 F. Supp. 3d 79 (D.D.C. 2016) ............................................................................ 22

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*,
246 F. Supp. 3d 52 (D.D.C. 2017) ............................................................................ 12

*Flagship Airlines and Transport Workers Union of Am.,*
1993 WL 13766341 (1993).......................................................................................... 12

*Hinton v. Corr. Corp. of Am.*,
624 F. Supp. 2d 45 (D.D.C. 2009) ............................................................................ 23

*International Ass'n of Machinists and Aerospace Workers v. Southern Pac. Transp. Co.,*
Civil No. S-80-150, 1980 WL 2170 (E.D. Cal. July 11, 1980) ................................. 22

*Itasca Lodge 2029 v. Ry. Express Agency, Inc.*,
391 F.2d 657 (8th Cir. 1968) ...................................................................................... 21

*Kaempe v. Myers*,
367 F.3d 958 (D.C. Cir. 2004) .................................................................................... 23

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994).................................................................................................... 20

*Pac. Fruit Express v. Union Pac*.,
826 F.2d 920 (9th Cir. 1987) ...................................................................................... 12

*Rivera v. Rosenberg & Assocs., LLC*,
142 F. Supp. 3d 149 (D.D.C. 2015)............................................................................ 23

*Ry. Labor Exec. Ass'n v. Norfolk & W. Ry.*,
833 F.2d 700 (7th Cir. 1987) ........................................................................................ 5

*Ry. Labor Execs.' Ass'n v. Wheeling & Lake Erie Ry. Co.*,
756 F. Supp. 249 (E.D. Va. 1991) *aff'd*, 943 F.2d 49 (4th Cir. 1991)...................... 21

*Town of Barnstable, Mass. v. F.A.A.*,
740 F.3d 681 (D.C. Cir. 2014)..................................................................................... 14

*United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*,
563 F.3d 257 (7th Cir. 2009*)* ..................................................................................... 21

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers, AFL-CIO,*
   243 F.3d 349 (7th Cir. 2001) ................................................................................................ 21

**Regulations**

14 C.F.R. § 135.100(c) ............................................................................................................ 15

14 C.F.R. § 139.305 ................................................................................................................ 15

14 C.F.R. § 139.311 ................................................................................................................ 15

14 C.F.R. § 139.329 ................................................................................................................ 15

## PRELIMINARY STATEMENT

In its Motion to Dismiss, Atlas Air, Inc. ("Atlas") established that the claims of Plaintiffs International Brotherhood of Teamsters, Airline Division, and the Airline Professional Association of the International Brotherhood of Teamsters, Local Union No. 1224 (collectively "IBT" or the "Union"), should be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Union's claims for injunctive and declaratory relief are deficient under Rule 12(b)(1) because they raise a minor dispute under the Railway Labor Act ("RLA") that is subject to mandatory arbitration before the Atlas Air, Inc. Crewmembers' System Board of Adjustment ("Atlas Adjustment Board"). They are not plausible under Rule 12(b)(6) because the documents IBT relies upon contradict the allegations in the complaint, and because implementation of a voluntary process whereby technicians may ask pilots on an individual-choice basis to perform maintenance-related engine starts cannot support a plausible claim for violation of the pilots' status quo terms of employment under the RLA.

In its opposition to Atlas's Motion under Rule 12(b)(1), the Union contends that its claims for injunctive and declaratory relief raise a major rather than a minor dispute because Atlas has purportedly never had a practice of allowing technicians to ask pilots to perform maintenance-related engine starts in which the Union has acquiesced, even though the evidence submitted by both parties indicates directly to the contrary. The Union further contends that it is unsafe for pilots to perform maintenance-related engine starts and that pilots are not adequately trained to conduct this procedure, although it does not indicate how these incorrect contentions are relevant to the RLA issues presented by Atlas's Motion. And in making its argument, the Union continues to assert falsely that Atlas's recent bulletins "direct" and "require" pilots to perform maintenance-related engine starts, even though they plainly do not, and the Union does

not even address Atlas's contention that a voluntary practice such as the one at issue here cannot involve a change to status quo terms of employment under the RLA.  The Union's opposition is therefore demonstrably unsupportable and must be rejected.

In order to establish that the Union's request for injunctive and declaratory relief raises a minor dispute within the exclusive jurisdiction of the Atlas Adjustment Board, Atlas need only show that it is "arguably justified" in asserting an established past practice whereby technicians are permitted to ask pilots to perform maintenance-related engine starts on a voluntary basis, and that the Union has acquiesced in this practice.  There is a strong presumption in favor of finding a minor dispute that can be overcome only if a carrier's contractual justification, either express or implied, is "frivolous" or "obviously insubstantial."  Atlas has more than satisfied this relatively light burden by submitting extensive evidence of the past practice -- including Aircraft Logs documenting 49 maintenance-related engine starts performed by pilots over a period of six years, testimony from maintenance personnel that pilots have been performing maintenance-related engine starts for at least the last ten years, and a FAA-approved General Maintenance Manual ("GMM") adopting procedures for maintenance-related engine starts conducted by pilots. Moreover, based on evidence provided by both Atlas and the Union, it is evident that the pilot group and the Union's leadership (including the head of the Atlas Pilots Executive Council) have been fully aware of this past practice for years, and while some pilots have declined a technician's request on an individual-choice basis, neither the pilots nor the Union leadership have ever asserted to Atlas that the practice of allowing technicians to ask pilots to perform maintenance-related engine starts violated the RLA or the CBA -- until the filing of this lawsuit.

The Union spends most of its opposition arguing that it is unsafe for pilots to perform maintenance-related engine starts and that pilots are not trained to conduct the procedure, but the

2

Union does not at any point indicate how its purported safety concerns are relevant to the jurisdictional determination of whether the implied terms of the CBA, interpreted in light of the past practice, permit such engine starts.  In any event, the Union's safety argument is fundamentally misleading and incorrect.  It ignores the fact that the FAA has approved Atlas's GMM provisions which expressly permit pilots to perform maintenance-related engine starts -- an approval to which courts are required to give deference.  It also ignores the facts demonstrated in Atlas's Motion regarding the FAA-approved safety protocols applicable to maintenance-related engine starts performed by both pilots and technicians, including authorization from airport officials, coordination with trained ground personnel, and blinking red lights to alert individuals on the tarmac that an engine will be starting.  It likewise ignores the evidence indicating that during the ten-year past practice, there have been no accidents or injuries at Atlas caused by pilots performing maintenance-related engine starts, and the complaint does not allege otherwise.  And it ignores the fact that pilots are most certainly trained to start the engines of an aircraft.  Starting an aircraft's engines is a core responsibility of the pilot position -- and pilots follow the same safety procedures and checklist whether they are conducting a maintenance-related engine start or an engine start for flight.

The Union also attempts to base its claim for declaratory judgment on the First Amendment, but the First Amendment plainly does not enable the Union to violate Section 2, First of the RLA or the injunction issued by this Court on November 30, 2017.  The Court already has enjoined the Union from discouraging voluntary pilot behavior on a concerted basis, such as open time flying and departing when aircraft are loaded and ready, and has rejected the Union's prior safety arguments as pre-textual.  Now, the Union seeks permission to direct pilots on a concerted basis to discontinue another voluntary behavior they have engaged in for many

years based on safety concerns it has utterly failed to substantiate. Such a direction by the Union

would unlawfully disrupt Atlas's operations and cannot be justified on First Amendment

grounds.

Even if this Court has jurisdiction to hear the Union's claims, and it does not, Atlas also

has demonstrated that the complaint fails plausibly to state a claim under Rule 12(b)(6). As

Atlas argued in its Motion, because maintenance-related engine starts are performed on a

voluntary basis, they do not involve a change in pilots' status quo working conditions or terms of

employment under Section 6 or Section 2, Seventh, of the RLA. The Union has failed to address

this argument in its opposition or to challenge the case authority cited by Atlas. The Motion

should be granted for this reason alone.

Atlas also established in its Motion that the Union's claims were not plausible because

the allegation that Atlas was "forcing" and "directing" pilots to perform maintenance-related

engine starts is contradicted by the bulletin relied upon in the complaint that governs the

maintenance-related engine start procedure. In response, the Union contends that the second

bulletin (OP 19-04) created confusion because, while it expressly says that maintenance-related

engine starts are voluntary and not required, it does not state that a pilot will not be subject to

discipline if he declines to perform the maintenance-related engine start. That illogical

contention is absurd -- the words "voluntary" and "not required" have a plain meaning that is

hardly confusing, and there is no allegation in the complaint that any pilot has ever been

disciplined for declining to perform a maintenance-related engine start or any other voluntary

function. The Union also contends that some pilots will likely feel coerced by flight operations

management to perform the voluntary maintenance-related engine starts, but there is no

allegation of such coercion in the complaint, and the extrinsic evidence offered by the Union on

4

this subject in witness declarations cannot be considered in resolving Atlas's Motion under Rule 12(b)(6).

For all of these reasons, as well as those discussed below and in Atlas's Motion, the complaint should be dismissed with prejudice.

## ARGUMENT

## I.   THE UNION'S CLAIMS FOR INJUNCTIVE RELIEF SHOULD BE DISMISSED UNDER RULE 12(B)(1) BECAUSE THEY RAISE MINOR DISPUTES

In its opposition, IBT acknowledges that disagreements between a carrier and a union over the interpretation or application of a collective bargaining agreement are minor disputes under the RLA.  (Opp. at 27.)  IBT further recognizes that "'when an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective bargaining agreement.'"  (*Id*. (*quoting Consol. Rail Corp. v. Railway Labor Executives' Ass'n ("Conrail")*, 491 U.S. 299, 307 (1989).)) The District of Columbia Circuit has held that it is rare for a dispute to arise during the term of a collective bargaining agreement that cannot be resolved by reference to the agreement itself, *Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc. ("E. Air II")*, 869 F.2d 1518, 1522 (D.C. Cir. 1989), and courts agree that any doubt about the classification of a dispute between a carrier and a union should be resolved in favor of finding the dispute to be minor rather than major, *see, e.g., id.* at 1524; *Bhd. of Maint. of Way Emps. v. Burlington N. Santa Fe R.R.*, 270 F.3d 637, 639 (8th Cir. 2001); *Ry. Labor Exec. Ass'n v. Norfolk & W. Ry.*, 833 F.2d 700, 705 (7th Cir. 1987); *Bhd. of R.R. Signalmen v. Nat'l R.R. Passenger Corp.*, 310 F. Supp. 3d 131, 138 (D.D.C. 2018).

Here, Atlas contends that it has an implied right under the CBA to allow its technicians to request that pilots perform maintenance-related engine starts on a voluntary basis.  The District of Columbia Circuit has held that such an implied right can be shown by a past practice in which

the Union has acquiesced. *Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc. ("E. Air I")*, 863 F.2d

891, 897 (D.C. Cir. 1988); *see also*, *Conrail*, 491 U.S. at 313, 317-20; *Bhd. of Locomotive*

*Eng'rs & Trainmen v. Union Pac. R.R.*, 879 F.3d 754 (7th Cir. 2017); *Airline Prof'ls Ass'n of the*

*Int'l Bhd. of Teamsters v. ABX Air, Inc.*, No. 00-4109, 2001 WL 1609934, at *4 (6th Cir. Dec.

31, 2001).  In cases involving implied contractual rights, the same "strong presumption" applies

in favor of finding a dispute under the RLA to be minor.  *E. Air. II*, 869 F.2d at 1522.

    Based on the evidence submitted both by Atlas and the Union, there is no doubt that

Atlas is "arguably justified" in contending that it has a past practice whereby technicians may

ask pilots to perform maintenance-related engine starts on a voluntary basis, and that the pilots

and Union knew about and acquiesced in the practice.  Atlas submitted Aircraft Logs

establishing that pilots conducted maintenance-related engine starts on at least 49 occasions over

the last six years, and that it likely happened on many additional occasions that could not be

identified because maintenance-related engine starts are not tracked in the maintenance data-

bases.  (Bussell Decl. ¶ 6, Ex. 2.)  Atlas also offered testimony from maintenance personnel

demonstrating that pilots have a long-standing practice of performing maintenance-related

engine starts when requested to do so by a technician over a period of at least ten years.  (*See*

Bussell Decl. ¶ 6, Ex. 2; Citrano Decl. ¶ 4; Carlson Decl. ¶ 10.)  Furthermore, Atlas provided

procedures for maintenance-related engine starts by pilots in its GMM, a document the Union

correctly notes has been approved by the Federal Aviation Administration ("FAA") (Opp. at 41),

and it has provided evidence that maintenance-related engine starts are performed not only by

pilots for Atlas but that it is a practice throughout the airline industry.  (*See* Bussell Decl. ¶¶ 4, 7;

Diedrich Decl. ¶ 10.)  And Atlas established that, prior to this lawsuit, no Union official ever

contended to Atlas that it was a violation of the RLA or the CBA for pilots to be asked by a technician to perform a maintenance-related engine start.  (Carlson Decl. ¶ 10.)

Although the Union contends in its opposition that it has never acquiesced in this past practice, the evidence it relies upon is to the contrary.  (Opp. at 35-36.)  IBT submits the declaration testimony of Captain Robert Kirchner ("Kirchner"), Chairman of IBT's Atlas Pilots Executive Council, indicating that he was asked by a technician to conduct a maintenance-related engine start in 2015 but declined to do so.  (Kirchner Decl. ¶ 10.)  This testimony does not support the Union's positon but rather supports Atlas's argument -- because it demonstrates that Kirchner personally knew of the practice whereby a technician could ask a pilot to perform a maintenance-related engine start and a pilot could decline on an individual-choice basis without incurring discipline.[1]  And this testimony also demonstrates that Union leadership acquiesced in this practice -- while Kirchner indicates that he personally chose to decline the technician's request, he does not testify that he ever asserted to Atlas that the practice of asking pilots on a voluntary basis to perform maintenance-related engine starts must be stopped because it was a violation of the RLA or the CBA.[2]  Indeed, IBT has not submitted any evidence that a Union official ever made such an assertion until immediately before it filed this lawsuit.

The Union's knowledge and acquiescence is further evidenced by the February 5, 2019, publication of the Teamster News in which the Union's Safety Committee addressed the issue of

---

[1] Contrary to what the Union suggests in its opposition, Atlas is not arguing that there is a past practice of all pilots actually conducting maintenance-related engine starts.  (*See* Opp. at 36.)  The past practice that Atlas has established is one whereby technicians are permitted to ask pilots to perform a maintenance-related engine start, and pilots are permitted, at their discretion, to oblige or decline.  Kirchner's experience is entirely consistent with the past practice Atlas has identified.

[2] In his declaration, Kirchner falsely accuses Atlas of misleading the Court by submitting an Aircraft Log with his name on it.  (Kirchner Decl. ¶ 10.)  According to Kirchner, "[t]he Company appears to have submitted that Log page through Mr. Bussel's declaration to 'confirm' that I or my flight crew performed a maintenance-related engine start."  (*Id.*)  To the contrary, Atlas submitted 49 Aircraft Logs all of which indicated that a crew member had performed a maintenance-related engine start, but Atlas did not contend that Kirchner had agreed to perform a maintenance-related engine start.

maintenance-related engine starts by pilots.  (Baranko Decl. ¶ 19, Ex. 16.)  Circulated to pilots

only four days after Atlas published OB 19-01, the Union stated "[o]ften, requests for

maintenance runs are driven by time and personnel constraints at the station."  (Baranko Decl. ¶

19, Ex. 16, at 3).  This reflects the Union's knowledge that there was a past practice of

maintenance-related engine starts that pre-dated OB 19-01 and indicates the Union's belief

regarding one reason for the past practice.  As such, this Teamsters News publication is directly

contrary to the Union's current argument that there was no past practice and that Atlas's issuance

of OB 19-01 constituted a first-time alteration of the status quo.  And the Teamsters News

publication also reflects the Union's acquiescence in the past practice -- while the publication

asked pilots individually to consider the safety of performing a maintenance-related engine start

upon request by a technician, it plainly did not assert that the past practice of allowing the

technicians to make such a request was a violation of the RLA or the CBA.

    The Union further asserts in its opposition that "[i]n the present case, the Union has

neither agreed to nor acquiesced in any practice by which Defendants would use pilots to

perform MX-Related Engine Runs.  The Union likewise has never agreed to nor acquiesced in

any practice whereby Defendants would use pilots to perform the maintenance-related engine

start component of MS[sic]-Related Engine Runs."  (Opp. at 35.)  Atlas, however, is not

claiming to have a past practice whereby technicians request that pilots perform "engine runs"

(i.e., the practice of starting the aircraft engines and engaging them at anything other than idle).

Atlas is claiming only to have a past-practice whereby technicians may ask pilots to perform a

maintenance-related "engine start," on a voluntary basis.  An engine start as described in OB 19-

01 never becomes an engine run because the pilot does not power the engines past idle, and

disengages them once the technician has verified the repair.  OB 19-01 expressly references this

difference, providing guidelines only for "an engine start" and indicating that "unless specifically trained, crewmembers will not perform maintenance engine run-ups." (Compl. Ex. 2; Arnold Decl. ¶¶ 7, 8.)

The Union also argues in its opposition that Atlas is engaging in "gamesmanship" and "bad faith" by claiming that it has a past practice of allowing technicians to ask pilots to conduct maintenance related engine starts. (Opp. at 34.) It attempts to downplay the substantial body of evidence produced by Atlas as a "handful" or a "scattering" of Aircraft Logs that stretch back only six years. (Opp. at 17, 32, 34, 36.) In reality, however, Atlas has produced admissible evidence of 49 instances of maintenance-related engine starts over a six-year period from a database that does not even track such occurrences. (Bussell Decl. ¶ 6.) Captain Baranko ("Baranko"), in his declaration submitted by the Union, identified an additional four instances that Atlas had not located when conducting its search. (Baranko Decl. ¶¶ 13(A)-13(C), 13(E).) And Atlas produced testimony from its maintenance personnel that pilots have voluntarily conducted maintenance-related engine starts upon request of a technician for a period of at least ten years. (Citrano Decl. ¶ 4; Bussell Decl. ¶¶ 4, 6.)

Similarly, the Union's argument that Atlas unilaterally changed the pilots' status quo terms of employment under the RLA because Atlas has never before published a bulletin regarding maintenance-related engine starts for inclusion in the Flight Operations Manual ("FOM") or the Flight Crew Operating Manual ("FCOM") is incorrect. (Opp. at 37.) OB 19-01 does nothing more than provide "guidelines" for a past practice that has existed at Atlas for many years with no assertion of illegality from the Union. (Carlson Decl. ¶ 10; Compl. ¶ 10; Compl. Ex. 2.) Despite the Union's continued contention that OB 19-01 changes the status quo because it "directs" and "requir[es]" pilots to conduct maintenance-related engine starts (Opp. at 2), the

bulletin itself proves this to be false.  (Compl. Ex. 2.)  OB 19-01 does not use those words and cannot reasonably be read to constitute a directive to perform maintenance-related engine starts. (*Id.*)  OB 19-04 makes this point abundantly clear by stating that "OB 19-01 was not intended and does not require that pilots perform engine starts when requested by maintenance.  A pilot's decision whether to perform such an engine start is entirely voluntary."  (Carlson Decl. ¶ 9; Baranko Decl. ¶ 4, Ex. 2.)

The Union also argues that "many pilots -- especially the many new, relatively inexperienced pilots at Atlas who have been hired over the last few years from the regional carriers -- likely will not feel that they can indeed chose not to perform a task when they are repeatedly badgered not just by maintenance personnel but by their own supervisors in the flight operations personnel, including their chief pilots."  (Opp. at 39.)  None of these so-called inexperienced pilots, however, have offered any testimony that they were "badgered" to accept a technician's request to perform an engine start.  The Union relies only on hearsay testimony from Baranko of instances in which flight operations personnel purportedly pressured pilots to perform maintenance-related engine starts.  Contrary to the Union's assertion, these examples do not evidence coercion but instead provide further support for the past practice as asserted by Atlas.

First and foremost, three of the five crews referenced by Baranko exercised their individual right to decline to conduct the maintenance-related engine start, and the Union does not contend that any of the crews were disciplined or suffered adverse action.  (Baranko Decl. ¶¶ 13(B), 13(C) and 13(E); *see also* Opp. at 17-19.)  Second, the crew purportedly pressured to perform a maintenance-related engine start on April 7, 2019, was actually asked by Flight Operations to perform a normal engine start after the aircraft had been released by maintenance

as airworthy.  (Welty Decl. ¶¶ 5-6.)  Third, while flight operations personnel attempted to contact

the pilot who purportedly was pressured to conduct a maintenance-related engine start in January

2019, this was not to pressure or coerce him but only to see if there was something that could be

done to make him comfortable with the process.[3]  (Diedrich Decl. ¶ 9.)  The pilot never spoke to

flight operations and, as is his right, declined to perform the maintenance-related engine start.

(Diedrich Decl. ¶ 6.)  Notably, the pilot from the April 7 incident confided in the flight

operations personnel that he was extremely nervous about maintenance-related engine starts

because the Union had directed pilots to change their past practice of voluntarily performing

them upon request of a technician.  (Welty Decl. ¶ 6.)  Accordingly, any recent issues with

maintenance-related engine starts appear to have been manufactured by the Union through a

communications campaign in violation of this Court's November 30, 2017 injunction.[4]

In sum, Atlas bears a very light burden in showing an implied right under the CBA to

allow technicians to ask pilots to conduct maintenance-related engine starts on a voluntary basis.

As long as Atlas can show that its position is "arguably justified" and not "frivolous" or

"obviously insubstantial," *Conrail*, 491 U.S. at 310, the disagreement between Atlas and the

Union over maintenance-related engine starts is a minor dispute that must be arbitrated before

the Atlas Adjustment Board.  Given all these facts -- the frequency of the maintenance-related

engine starts by pilots, the extended period of time over which they have occurred, the fact that

they are common in the industry, the fact that Kirchner knew they were taking place, the fact that

the Teamster News indicated that the Union's Safety Committee knew they were taking place

---

[3] If a pilot declines to perform a maintenance-related engine start, a member of flight operations may contact him or her to see if there is an issue that they can work through together so that the pilot is comfortable with the procedure. (Welty Decl. ¶ 9.)  The contact is not intimidating or harassing.  (*Id.*)  Atlas has learned over the years that pilots will sometimes decline to perform a maintenance-related engine start because of a circumstance that the parties can alleviate if flight operations works with the pilot.  (*Id.*)

[4] In this regard, the Union published a message to pilots on February 5, 2019, recommending that "crewmembers think carefully before accepting directives to a [sic] perform maintenance run/start."  (Baranko Decl. ¶ 19, Ex. 16.)

and had a view as to the reason for such practice, and the fact that the Union never asserted that this practice violated the RLA or the CBA prior to filing this lawsuit -- it is not "frivolous" or "obviously insubstantial" for Atlas to contend that it had a past-practice that the Union knew about and in which it acquiesced.[5] *See Bhd. of Locomotive Eng'rs & Trainmen*, 879 F.3d at 759 (holding that "[t]he Railroad's declaration is enough to show that its position is not frivolous, though it may or may not prevail.")[6]

---

[5] IBT requests that, in lieu of dismissing the complaint, the Court should provide the Union "with sufficient time to conduct discovery in order to obtain relevant information and facts to demonstrate that the Court does indeed have jurisdiction." (Opp. at 39.) The Union's request should be denied because the Union has not even attempted to identify the discovery it might propound that could save its deficient claims. *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 92 (D.D.C. 2017) ("Jurisdictional discovery is only appropriate where the party seeking such discovery provides 'some specific indication . . . regarding what facts additional discovery could produce that would affect the court's jurisdictional analysis."); *Baptist Mem'l Hosp. v. Johnson*, 603 F. Supp. 2d 40, 44 (D.D.C. 2009) ("When requesting jurisdictional discovery, however, a plaintiff must make a 'detailed showing of what discovery it wishes to conduct or what results it thinks such discovery would produce. . . ."). Moreover, permitting jurisdictional discovery in a case involving an arguable minor dispute under the RLA has the potential to intrude on the exclusive jurisdiction of a System Board of Adjustment to determine the discovery procedures, if any, for an arbitration regarding the minor dispute. *See Pac. Fruit Express v. Union Pac*., 826 F.2d 920, 923 (9th Cir. 1987) (court-ordered discovery for use in arbitration before a System Board would be "incompatible with the aims and structure of the Railway Labor Act"); *Air Line Pilots Ass'n v. Trans World Airlines*, *Inc*., 729 F. Supp. 888, 890 (D.D.C. 1989) (union's request for court order compelling discovery in a System Board arbitration denied on the ground that "court-ordered disclosure . . . is inconsistent with the history and principles of the Railway Labor Act.'") (internal citation omitted). The RLA does not provide for discovery in Board of Adjustment arbitrations, and many Boards of Adjustment do not permit discovery unless required by the collective bargaining agreement. *See Bhd. of Maint. of Way Employees Div./IBT v. Norfolk S. Ry. Co.*, 2012 WL 4461690, at *19 (N.D. Ill. Sept. 25, 2012), *aff'd*, 745 F.3d 808 (7th Cir. 2014) ("there is no right to pre-hearing discovery absent express contractual language explicitly creating such a right"); *see, e.g., Flagship Airlines and Transport Workers Union of Am.,* 1993 WL 13766341, at *5 (1993) (Spurlock, Arb.) (refusing to order discovery in airline System Board arbitration where collective bargaining agreement did not provide for discovery in arbitration process). If unions could avoid those restrictions by filing a lawsuit and obtaining jurisdictional discovery for eventual use in an arbitration, the RLA and System Board procedures would be significantly undermined.

[6] Kirchner takes issue with the declaration testimony from Captain Jeffrey Carlson that pilots are paid for maintenance-related engine starts because they are required to report for duty an hour-and-a-half prior to the scheduled departure of their flight. (Carlson Decl. ¶ 6.) Kirchner contend that pilots are only paid for pilot work and that "the CBA has never included performance of maintenance-related starts/runs and it has never included any compensation provisions for the performance of such a procedure." (Kirchner Decl. ¶ 13(A).) Kirchner is wrong. The CBA requires pilots to appear for duty an-hour-and-a-half prior to flight in order to conduct preflight duties such as checking the weather, visually inspecting the aircraft, and completing required checklists. (Carlson Decl. ¶ 6.) One of these preflight duties, based on established past practice and Union acquiescence, is the maintenance-related engine start on a voluntary choice basis. Whether or not the CBA permits maintenance-related engine starts, and provides compensation, is a matter of contract interpretation and raises a minor dispute for the Atlas Adjustment Board.

## II.   THE UNION CANNOT ESTABLISH A MAJOR DISPUTE UNDER THE RLA BY ARGUING THAT MAINTENANCE-RELATED ENGINE STARTS ARE UNSAFE, OR THAT PILOTS ARE NOT TRAINED TO PERFORM MAINTENANCE RELATED ENGINE STARTS

The Union spends much of its opposition contending that maintenance-related engine starts are unsafe when performed by pilots and that pilots are not trained to perform them.  (Opp. at 4-16.)  The Union, however, makes no attempt to explain how its safety argument is in any manner related to the minor dispute analysis.  In fact, it is not related -- the determination of whether this case involves a major or a minor dispute rests solely on whether the CBA arguably permits technicians to request that pilots perform maintenance-related engine starts and not on the Union's supposed safety and training concerns.  Atlas has established that the CBA arguably permits maintenance-related engine starts by pilots on a voluntary basis, and the Union's safety contentions have no bearing on this analysis.

Nevertheless, even if safety and training were relevant to the minor dispute analysis, the Union has shown no safety risk or training deficit in regard to pilots who perform maintenance-related engine starts.  With respect to safety, the Union quotes extensively from manuals promulgated by Boeing to support the unremarkable assertion that jet engines are powerful and can be dangerous.  (Opp. at 4-6.)  The Union also submits declarations from two pilots, Kirchner and Baranko, further asserting that a jet engine can pose dangers,[7] and it refers to the allegation in its complaint that a mechanic was sucked into the engine of an aircraft at Continental Airlines at some undisclosed point in time.  (*Id*. at 6-7; Kirchner Decl. ¶ 8(A); Baranko Decl. ¶ 6.)

---

[7] Kirchner testifies that "to the extent pilots have done such maintenance-related engine starts and runs, they did so contrary to Atlas's flight operations manuals and procedures and risked the loss of their commercial pilots licenses, and even arrest and prosecution in some foreign countries, had something gone wrong when they did it."  (Kirchner Decl. ¶ 11.)  Kirchner provides no support for these legal conclusions or any foundation for his contention that pilots would be subject to arrest had something gone awry.

As noted by Atlas in its opening brief, the FAA is responsible for regulating the safety of air carriers and airports, and courts should not be called upon to make safety determinations that Congress has reserved to the FAA. *See Air Line Pilots Ass'n v. United Air Lines, Inc.*, No. 11 CV 4461 SJ, 2011 WL 4543820, at *4 (E.D.N.Y. Sept. 29, 2011). The FAA has promulgated regulations governing subjects such as the markings, signs, and lighting of airport taxiways and runways, *see, e.g.* 14 C.F.R. § 139.305; 14 C.F.R. § 139.311, the activity of aircraft and ground vehicles in and around taxiways and runways, *see* 14 C.F.R. § 139.329, and the "critical phases of flight [that] includes all ground operations involving taxi . . . and all other flight operations conducted below 10,000 feet," 14 C.F.R. § 135.100(c). As the Union readily admits, the FAA has approved of Atlas's GMM -- and the GMM expressly provides for maintenance-related engine starts by pilots. (Bussell Decl. ¶ 4; Opp. at 7.) If the FAA had concluded that pilots should not be conducting maintenance-related engine starts, or that they should do so only under certain limited conditions, it would not have approved this aspect of the GMM, and it would have promulgated regulations governing the process. The courts have expressly recognized that deference must be accorded to the FAA with respect to such safety-related decisions. *Town of Barnstable, Mass. v. F.A.A.*, 740 F.3d 681, 688 (D.C. Cir. 2014) (rejecting challenge to FAA actions because "they ignore the statutory scheme Congress created and the deference this court owes to the reasonable interpretation of the FAA, acting for the Secretary, in implementing the statute"); *Air Line Pilots Ass'n, Int'l v. Trans World Airlines, Inc.*, 713 F.2d 940, 950 (2d Cir. 1983), *rev'd on other grounds Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985) (rejecting challenge to FAA rule regarding pilot qualifications in part because "[t]he FAA [is] the paramount agency charged with airline safety").

Moreover, the Union has failed to submit any evidence showing that safety has been compromised at Atlas.  For example, the Union has failed to counter the evidence from Atlas's Senior Director of Maintenance that over a period of at least ten years not a single person or thing has been injured by an Atlas pilot performing a maintenance-related engine start.  (Citrano Decl. ¶ 9.)  The Union has not offered any evidence of aircraft damage or near miss incidents resulting from maintenance-related engine starts performed by pilots, and has failed even to address the ample safety precautions Atlas described in its Motion whereby a pilot may not conduct a maintenance-related engine start until the technician obtains clearance from airport authorities, the pilot receives clearance from trained ground-handling employees who remain in contact with the pilot throughout the process and who ensure that no hazards are present on the ground, and the pilot has illuminated the flashing red lights on the top and belly of the aircraft alerting all personnel on the tarmac that the engines will start.  (*Id.* ¶¶ 5-6.)  It is evident that someone will be performing the maintenance-related engine starts, and IBT has presented no evidence that it is safer for a technician rather than a pilot to do the job.

In an effort to bolster its safety narrative, the Union badly distorts an email chain between Joshua Arnold ("Arnold"), Senior Director of Safety for Atlas, and Christopher Sidor ("Sidor"), the Chairman of the Atlas Pilots Safety Committee for IBT Local 1224.  (Opp. at 20, 35.)  The Union also attempts to confuse the distinction between an "engine start," which is the subject of OB 19-01, OB 19-04 and the Union's complaint in this case, and an "engine run," which is the subject of the Arnold/Sidor email exchange and prohibited by OB 19-01 unless the pilot is "specifically trained."  The Arnold email is entirely consistent with OB 19-01 and further undermines any contention that maintenance-related engine starts by pilots pose a threat to safety at the airport.

The initial email from Sidor to Arnold raised the subject of "maintenance runs." (Baranko Decl. ¶ 14, Ex. 15.)  Arnold responded to Sidor by stating that "I can only imagine from the timing of this is due to 658 in Rockford."  (*Id.*)  The incident in Rockford, which occurred only a few days earlier, on January 22, involved an "engine run" in which a technician advanced the throttle from idle to high power.  (Arnold Decl. ¶ 4.)  The aircraft dislodged from its blocks and damaged another aircraft parked nearby.  (*Id.*)  Thus, when Arnold stated in the fourth paragraph of his email that "it is my opinion that if a crew isn't trained for it they shouldn't be doing it," he was referring to a high-powered "engine run" of the type conducted in Rockford.  (*Id.* ¶ 5.)

A few days later, Arnold received a copy of OB 19-01 and observed that it provided guidelines for "engine starts," which unlike "engine runs" involve only starting the engine at idle.  (*Id.* ¶ 7.)  He also noticed that the bulletin stated that "Unless specifically trained, crew members will not perform maintenance run-ups."  (*Id.*)  Arnold, who is a pilot qualified by the FAA to fly the Boeing 747 aircraft, was in full agreement with the bulletin because he knew that pilots may safely conduct "engine starts" at idle power in order to verify maintenance activity but that "engine runs-ups" applying additional power require specified training.  (*Id.* ¶¶ 2, 8.) Hence, any contention by the Union that Arnold's email questions the safety of pilot-conducted maintenance-related engine starts, as opposed to engine run-ups, is entirely misplaced.

Tellingly, in contrast to its verified complaint, which alleges that "Defendants are now forcing pilots to perform Engine Starts" and which repeatedly objects to "Engine Starts," in its opposition the Union abandons its complaint allegations and repeatedly refers to "MX-Related Engine Runs."  (*Compare* Compl. ¶¶ 1-2, 10, 16, 19, *with* Opp. at 3-5, 9, 12-13, 17-20.)  The Union's shift from "Engine Starts" to "Engine Runs" is so disingenuous that it even falsely states

in its opposition that OB 19-01 "require[s] that pilots perform maintenance-related engine starts *and run-ups* (hereafter, 'MX-Related Engine Runs')." (Opp. at 2 (emphasis added).)[8]  As discussed above, and in Atlas's Motion, not only does OB 19-01 not "require" pilots to conduct maintenance-related engine starts or run-ups, it expressly counsels pilots not to perform engine *run-ups* (as opposed to *starts)* "unless specifically trained." (Compl. ¶ 10; Compl. Ex. 2.)  The Union's abandonment of the allegations in its complaint, its failed effort in its opposition to equate "engine starts" with "engine runs," and its blatant mischaracterization of the Arnold email and OB 19-01, further confirms that there is no safety issue with maintenance-related engine starts, and highlights the folly of this entire litigation.[9]

The Union is equally unconvincing in its contention that pilots are not trained to perform maintenance-related engine starts.  It quotes at length from training requirements set forth in the GMM and contends that pilots have not received the referenced training.  (*See* Opp. at 9-15.) These requirements, of course, apply to maintenance personnel who are not otherwise trained to start the engine of an aircraft.  (Citrano Decl. ¶¶ 4-6.)  Pilots, on the other hand, are trained to start the engines of an aircraft, and they follow the exact same procedures, and use the same checklists, whether they are conducting a maintenance-related engine start or starting the engines to initiate flight.  (*Id.*)  OB-19-01 makes this clear stating that pilots are to "Follow all Normal Before Start, Start, Shutdown, and After Shutdown Procedures and Checklists." (Compl. Ex. 2.)

The Union further contends that engine starts are part of a "highly choreographed, practiced, and repeatedly performed script" and that while pilots "know how to start an aircraft's

---

[8] Baranko also falsely makes this claim about OB 19-01 in his sworn declaration testimony.  (Baranko Decl. ¶ 2.)
[9] The Union and Baranko further mischaracterize OB 19-01 as directing and ordering pilots to "start[] aircraft powerplants (i.e., engines) and auxiliary power systems and/or operate[] associated aircraft system or flight controls for the purpose of diagnosing, evaluating, or complying with required maintenance action." (Compl. ¶ 10; Baranko Decl. ¶ 2.)  OB 19-01 provides guidelines only for "engine starts."

engines, [] they do so in controlled settings in accordance with procedures set forth in the

FCOM, after the aircraft has been released back to service in an airworthy condition ready for

operation." (Opp. at 16, 21.)  What the Union fails to explain is how a maintenance-related

engine start is any different from the "highly choreographed" engine start before a flight

assignment.  As OB 19-01 confirms, pilots follow the same procedures in both types of engine

starts, the aircraft is in the same position on the tarmac, and it is irrelevant whether the aircraft is

"airworthy" because the aircraft has not yet been released for flight.  (*See* Compl. Ex. 2.)  The

Union has failed to provide any plausible explanation for why a pilot is untrained or unqualified

to start the same aircraft engine that he or she admittedly is going to start in any event once the

maintenance check is completed.[10]

While the Union contends that pilots are violating the FOM or the FCOM if they conduct

a maintenance-related engine start, that is not true.  (*See* Opp. at 3, 15-16.)  These manuals do

not prohibit maintenance-related engine starts and pilots conduct many procedures that are not

specifically addressed in the FOM or the FCOM.  (Welty Decl. ¶ 8.)  With respect to engine

starts, the FOM states as follows: "In order to prevent injury to personnel or damage to

equipment, engines shall not be started until a clear to start signal is received from ground

personnel.  If there is any doubt about what is desired, delay the start until the situation can be

clarified with ground personnel." (*Id.*)  As noted above, the procedures for pilot conducted

maintenance-related engine starts are entirely consistent with these provisions of the FOM.

Accordingly, while pilot training and safety are not relevant to the legal determination

regarding this Court's jurisdiction, the Union has presented nothing more than misleading and

---

[10] The Union's contention that pilots cannot operate an aircraft until it has been released as airworthy is precluded by its own admission that the FAA has approved Atlas's GMM.  (Opp. at 7.)  The GMM expressly permits pilots to conduct maintenance-related engine starts and the FAA would not have approved this aspect of the GMM if it objected to this procedure.  (Bussell Decl. ¶ 4.)

unsupported contentions to suggest that maintenance-related engine starts pose any danger to pilots, airport personnel or the public at large, or that pilots lack relevant training.  The admissible evidence establishes the contrary.

III.    **THE UNION'S CLAIM FOR DECLARATORY RELIEF SHOULD BE DENIED UNDER RULE 12(B)(1) BECAUSE IT RAISES A MINOR DISPUTE AND BECAUSE IT WOULD CONFLICT WITH THIS COURT'S INJUNCTION**

The Union seeks a declaratory judgment that it may initiate a major dispute strike, including the right to direct pilots on a concerted basis not to perform maintenance-related engine starts.  (*See* Compl. Prayer For Relief, §§ B, C.)  As noted by Atlas in its Motion, the Union's request for declaratory relief should be rejected because the disagreement in this case -- whether pilots may be asked by technicians to perform maintenance-related engine starts on a voluntary basis -- raises a minor dispute within the exclusive jurisdiction of the Atlas Adjustment Board.  (Motion at 20-22.)  Atlas further demonstrated that even if the Court were to find a status quo violation, and issue the injunction requested by the Union, the status quo would thus be restored and the Union would have no legal basis for a strike.  (*Id*. at 21 n.8; *see* Compl. ¶ 47 (citing cases).)

The Union's primary argument in opposition is that Atlas has not established a past practice of allowing technicians to request that pilots conduct maintenance-related engine starts.  (Opp. at 40-41.)  For the reasons discussed above, and in its Motion, Atlas has presented more than the necessary evidence of a past practice and Union acquiescence to meet the "arguably justified" standard under *Conrail*.  Thus, the Court does not have jurisdiction to impose a declaratory judgment in the context of this minor dispute.

The Union similarly contends that "regardless of . . . Defendant's 'minor dispute argument . . . the Court has an independent jurisdictional basis by which to assert subject matter jurisdiction."  (Opp. at 42.)  According to the Union, the Court has ancillary jurisdiction over the

Union's declaratory judgment claim because that claim is "factually interdependent" with Atlas's claim in the injunction case tried by the Court in November 2017, and because it would enable the Court to "manage its proceedings, vindicate its authority and effectuate its decrees." (Opp. at 43; *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994).) The *Kokkonen* case is not remotely on point, and the Court has no basis to exercise ancillary or any other jurisdiction. Indeed, *Kokkonen* did not involve a labor dispute and the Supreme Court ruled that ancillary jurisdiction did not exist in that case. *Id.* at 379-82.

The predicate for IBT's declaratory relief action is that Atlas has created a major dispute by unilaterally changing the pilots' status quo terms of employment under Section 6 and Section 2, Seventh of the RLA. (Compl. ¶¶ 31, 34, 37.) As explained in detail above, the question of whether or not Atlas has the right to allow technicians to request that pilots perform maintenance-related engine starts on a voluntary basis raises a minor dispute for the exclusive jurisdiction of the Atlas Adjustment Board. The Court cannot determine whether a status quo violation exists, and whether the requested declaratory relief should be awarded, without resolving the minor dispute and invading the jurisdiction of the Atlas Adjustment Board. *See E. Air*, 869 F.2d at 1524-25. Nothing in *Kokkonen* or any other authority permits this Court to decide the merits of a minor dispute and to upset the mandatory arbitration process compelled by the RLA.

The Union further contends that the Court should grant its requested relief because the First Amendment purportedly protects a Union's right to disseminate facts related to a labor dispute. This right, the Union contends, extends to "the contents of their members' CBA as well as their members' rights and responsibilities concerning safety issues." (Opp. at 41-42.) The First Amendment, however, does not enable the Union to violate Section 2, First of the RLA, or

this Court's injunction against the Union's illegal slowdown.  *See e.g.*, *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l ("UAL v. ALPA II")*, 563 F.3d 257, 259-260 (7th Cir. 2009); *United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers, AFL-CIO ("UAL v. IAM")*, 243 F.3d 349, 357, 368 n.14 (7th Cir. 2001) (affirming injunction prohibiting "any kind of slowdown activity or other work action"); *Itasca Lodge 2029 v. Ry. Express Agency, Inc.*, 391 F.2d 657, 669 (8th Cir. 1968) (finding that an injunction "specifically directed at preventing a work stoppage" did not violate the First Amendment); *Ry. Labor Execs.' Ass'n v. Wheeling & Lake Erie Ry. Co.*, 756 F. Supp. 249, 253 (E.D. Va. 1991) ("[W]hile picketing is a form of speech protected by the First Amendment, it is appropriate to enjoin unions from picketing in furtherance of their representation dispute . . . because such action would violate the RLA."), *aff'd*, 943 F.2d 49 (4th Cir. 1991).

This principle is not altered because the Union has asserted completely unsubstantiated safety concerns that ignore the FAA's regulatory decisions and a ten-year past history with no accidents, injury or damage.  The Union has provided no evidence of any safety incidents that have arisen at Atlas with respect to any maintenance-related engine start by a pilot, and its invocation of safety now, in the midst of collective bargaining, must be deemed as a pre-textual invitation for pilots to slowdown the airline's operations -- in violation of Section 2, First of the RLA and this Court's injunction.  *See, e.g., Atlas Air*, *Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 91 (D.D.C. 2017); *see also UAL v. ALPA II*, 563 F.3d at 272; *UAL v. IAM,* 243 F.3d at 366-67.

The Court previously has enjoined the Union from encouraging pilots to decline voluntary duties (e.g., open time flying and departing when loaded and ready), and it should not

expressly condone that same practice here where the Union has made no valid showing of a safety-related issue.

## IV.   THE UNION DOES NOT PROVIDE ANY VALID REASON WHY ITS CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF SHOULD NOT BE DISMISSED UNDER RULE 12(B)(6)

In its Motion, Atlas identified several deficiencies that rendered the Union's claims implausible under Rule 12(b)(6).  (Motion at 22-25.)  The Union ignores almost all of those deficiencies in its opposition, devoting a single paragraph to a defense of its claims.  The Union has therefore failed to explain how its claims are plausible and they should therefore be dismissed.

As Atlas demonstrated in its Motion, the complaint fails to state a claim because Atlas could not have violated the pilots' status quo terms of employment or working conditions under Section 6 or Section 2, Seventh of the RLA by implementing a maintenance-related engine start procedure that is purely voluntary.  (Motion at 25.)  Atlas noted that in a similar case denying a union's request for a major dispute injunction under the RLA, one court held that "[b]ecause voluntary testing would involve individual decisions made freely by individual employees, by no stretch of the imagination could this be construed to be a change in working conditions."  *Int'l Ass'n of Machinists and Aerospace Workers v. S. Pac. Transp. Co.,* Civil No. S-80-150, 1980 WL 2170, at *4 (E.D. Cal. July 11, 1980).  The Union has failed to address this ground for dismissal in its opposition and Atlas's motion should be granted for this reason alone.  *Dawn J. Bennett Holding, LLC v. FedEx TechConnect, Inc.*, 217 F. Supp. 3d 79, 82 (D.D.C. 2016) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, the court may treat those arguments that the plaintiff failed to address as conceded.") (internal citations omitted); *Brookens v. United States*, 981 F. Supp. 2d 55, 62 (D.D.C. 2013) ("Where a plaintiff [does not address] some . . .

arguments raised in a defendant's motion to dismiss, courts in this district may treat such arguments as conceded.") (internal citations omitted).

Atlas also demonstrated that the Union's claims should be dismissed as implausible because they are based on the unsupportable allegation that OB 19-01 altered the status quo terms of employment by "requiring" and "forcing" pilots to perform maintenance-related engine starts.  (Motion at 23-24.)  Because the plain language of OB 19-01 does not "require" or "force" pilots to perform maintenance-related engine starts, but only sets forth "Guidelines" for pilots who are "requested by maintenance to conduct an engine start," the Union's claims for injunctive and declaratory relief are not plausible.  *See Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004); *Rivera v. Rosenberg & Assocs., LLC*, 142 F. Supp. 3d 149, 161 (D.D.C. 2015). Moreover, as Atlas indicated in its Motion, OB 19-04 expressly clarified that the maintenance-related engine starts referenced in OB 19-01 are "voluntary" and "not required."[11]  The Court may consider OB-19-04 because IBT is required to rely on all of the policy documents governing maintenance-related engine starts and cannot omit this essential communication.  *See Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 47 (D.D.C. 2009).

In its opposition, the Union provides only a cursory response to Atlas's arguments, contending that Atlas's Rule 12(b)(6) motion should be denied because "[d]efendant's factual claims as well as their characterization of the meaning and effect of OB 19-04 is in dispute, as discussed above and in the declarations supporting this memorandum," and because Atlas purportedly relies on "the same incorrect and refuted facts relating to . . . their false past practice."  (Opp. at 43-44.)  The Union's contentions, however, are demonstrably incorrect.

---

[11] The Union asserts that reliance on OB 19-04 is not permitted because it was issued after the complaint was filed, but cites no precedent or authority in support of its assertion.  (Opp. at 43.)

First, it is obvious that Atlas relies only on the complaint allegations and the plain language of the bulletins in support of its Rule 12(b)(6) motion.  Contrary to the Union's argument, Atlas's evidence regarding the parties' past practice was submitted solely in support of its Rule 12(b)(1) motion, and need not be considered in resolving the Rule 12(b)(6) motion.

Second, the Union's argument regarding the purported disputed meaning of OB 19-04 is utterly baseless.  According to the Union, while OB 19-04 expressly states that the maintenance-related engine starts are "voluntary" and "not required," the bulletin nonetheless creates "confusion" because it "does not state that pilots will be not be subjected to contractual discipline if they chose not to perform those procedures. . . ."  (Opp. at 39.)  This contention is absurd -- the words "voluntary" and "not required" have a plain meaning that is hardly confusing, and there is no complaint allegation that any pilot has ever been disciplined for refusing to perform a voluntary function, be it a maintenance-related engine start or otherwise.

Third, the Union's additional argument, that application of OB 19-04 is not clear because some pilots will "likely" feel coerced by flight operations management to perform the voluntary maintenance-related engine starts, fails because it is admittedly based on witness declarations rather than complaint allegations. (Opp. at 39.)  Reliance on such extrinsic evidence is impermissible under Rule 12(b)(6).  *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("'It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.' . . .  Because there is no hint of these meetings and alleged express contracts in the Amended Complaint, the Court therefore cannot consider these allegations in deciding the instant motion to dismiss."); (*infra* at 11-12)*,* the Union's declarations do not in any event provide credible evidence that the pilots have been coerced to perform maintenance-related engine starts; to the contrary, they show that pilots have been aware

24

of and have exercised their right to decline the request on an individual-choice basis in

accordance with OB 19-01 and OB 19-04.

## <u>CONCLUSION</u>

For the reasons discussed above, and those contained in Atlas's Motion, the Court should

dismiss all claims with prejudice.

Dated:   April 22, 2019                                    Respectfully submitted,
         Washington, D.C.

                                                 By:   _____/s/ Robert A. Siegel_____
                                                       Robert A. Siegel
                                                       (D.C. Bar #1004474)
                                                       Michael G. McGuinness
                                                       (*pro hac vice* pending)

                                                       O'MELVENY & MYERS LLP

                                                       1625 Eye Street, NW
                                                       Washington, D.C. 20006
                                                       Telephone:  (202) 383-5300
                                                       Facsimile:  (202) 383-5414
                                                       rsiegel@omm.com

                                                       400 South Hope Street
                                                       Los Angeles, California 90071
                                                       Telephone:  (213) 430-6000
                                                       Facsimile:  (213) 430-6407
                                                       mmcguinness@omm.com

                                                       *Attorneys for Defendants*